UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

EMILY DOMINGUEZ,

                              Plaintiff,

              -v-

THOMAS E. WALSH II, *et al.*,

                              Defendants.

No. 22-CV-6443 (KMK)

<u>OPINION & ORDER</u>

<u>Appearances</u>:

Nathaniel B. Smith, Esq.
New York, NY
*Counsel for Plaintiff*

John D. Lenoir, Esq.
Austin, TX
*Counsel for Plaintiff*

Darius P. Chafizadeh, Esq.
Mathew T. Dudley, Esq.
Harris Beach Murtha Cullina PLLC
White Plains, NY
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

Plaintiff Emily Dominguez ("Plaintiff") brings this Action pursuant to §§ 1983 & 1988

and state law against Rockland County (the "County") and its employees Rockland County

District Attorney Thomas E. Walsh, II, Investigator Deidre Smith (also known as Deidre Smith

Withers), and Investigator Conor Fitzgerald (together with the County, "Defendants").  (*See*

Third Am. Compl. ¶¶ 1–10 ("TAC") (Dkt. No. 36).)[1]  In the Third Amended Complaint, Plaintiff

raises myriad claims against Defendants arising under federal and state law.  (*See generally id.*)

Before the Court is Defendants' Partial Motion to Dismiss Plaintiff's Third Amended

Complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "Motion").  (*See* Not. of

Partial Mot. to Dismiss (Dkt. No. 46).)  For the reasons stated below, the Motion is denied in part

and granted in part.

I. Background

A. Factual Background

The following facts are drawn from Plaintiff's Third Amended Complaint and are taken

as true for the purposes of resolving the instant Motion.  *See Div. 1181 Amalgamated Transit

Union-N.Y. Emps. Pension Fund v. N.Y.C. Dep't of Educ.*, 9 F.4th 91, 94 (2d Cir. 2021) (per

curiam).

1.  The Campaign and Subsequent Investigation

Plaintiff is a former resident of the Village of Haverstraw, a municipal local village in

Rockland County with a population of about 40,000 individuals, approximately sixty percent of

which identifies as Hispanic.  (TAC ¶¶ 4, 13, 17.)  Plaintiff and her mother, Luz Gutierrez, were

politically active and well-known organizers for the Hispanic community in Rockland County.

(*Id.* ¶ 14.)  Plaintiff and her mother "marshal[led] significant political influence" within that

community and "supported numerous candidates for local and state elected offices."  (*Id.* ¶ 16.)

As of 2019, Plaintiff was the Deputy Mayor for the Village of Haverstraw and also held an

elected position as Village Trustee.  (*Id.* ¶ 18.)

_____

[1] Unless otherwise noted, the Court cites to the ECF-stamped page number in the upper-right corner of each page in cites from the record.

2

In 2019, Walsh campaigned for the office of Rockland County District Attorney and "expected political support" in that campaign from Plaintiff and her mother, "based on their prior support of him." (*Id.* ¶ 19.) However, Plaintiff and her mother refused to support Walsh's campaign "because of allegations that Walsh engaged in sexual misconduct and abuse of young women." (*Id.* ¶ 20.) Instead, they "actively and vigorously supported" the candidate running against Walsh—Kenneth P. Zebrowki—"through public endorsements, fundraising activities, and securing sufficient signatures of residents on petitions for Zebrowski to be placed on the ballot as a candidate for office." (*Id.*) Walsh won the election for District Attorney in November 2019 and assumed office on January 1, 2020. (*Id.* ¶ 22.)

In the summer of 2019, while the campaign was still ongoing, Walsh and his domestic partner, Zahira Rodriguez, informed a councilman for Haverstraw, Johnny Ortiz, that "they had plans to destroy [Plaintiff's] political career." (*Id.* ¶ 21.) Plaintiff alleges that Rodriguez stated she and Walsh had obtained copies of Plaintiff's tax returns—which she then displayed to Ortiz—and informed Ortiz "they were going to use those tax returns to damage [Plaintiff's] reputation and destroy her." (*Id.*)

Plaintiff also alleges that "[f]rom the summer of 2020" and through 2021, Walsh abused his position "by launching a broad investigation into all facets of [Plaintiff's] person, business, and political affairs." (*Id.* ¶ 24.) This included "issuing at least a dozen subpoenas to local officials and agencies, telephone carriers, and private businesses and banks in an overly broad and unlimited fishing expedition about [Plaintiff.]" (*Id.*) Plaintiff alleges that, upon information and belief, these subpoenas were not used to provide evidence to any grand jury reviewing specific charges but instead, "were improperly used by Walsh as an investigative tool to obtain any negative information on [Plaintiff]." (*Id.*) Plaintiff further avers that Walsh used "informal

means" to investigate her, including telling Ralph Bueno (a trustee for the Village of Haverstraw) that he was looking for "dirt" on Plaintiff and asking if Bueno had any such information. (*Id.* ¶ 25.) When Bueno asked Walsh why he was looking for "dirt" on Plaintiff, Walsh informed him that Plaintiff was one of his "targets." (*Id.*)

In July 2021, the Village Trustees voted to request the Village's insurance company to indemnify and provide legal counsel to Plaintiff in connection with the subpoenas. (*Id.* ¶ 26.) After the vote, two of Walsh's investigators visited Bueno and informed him that they knew he voted in support of the request, that Walsh was "very unhappy" about that, and warned Bueno that if he "continued to help [Plaintiff] he would find himself in the same position as [her.]" (*Id.*)

Plaintiff alleges that by August 2021, she and her family were subjected to "constant surveillance by local law enforcement" officials who, upon information and belief, were acting on behalf of Walsh "to find any kind of dirt on [Plaintiff.]" (*Id.* ¶ 27.) Several of Plaintiff's "close contacts" told her that Walsh "made it clear to them" that they should stay away from Plaintiff's family and do nothing to help her, otherwise "Walsh would make them a target as well." (*Id.* ¶ 28.) Plaintiff further alleges that in September 2021, law enforcement officers "working for Walsh" were captured on video putting a nail into one of Plaintiff's tires while it was parked in a private area. (*Id.* ¶ 29.) This incident caused "extreme anxiety" for Plaintiff, because she knew she was on Walsh's "hit list" and that he was out to "destroy" her. (*Id.*) That same month, law enforcement executed a search warrant for, and took possession of, Plaintiff's cell phone. (*Id.* ¶ 30.)

By the end of the month, due to the ongoing strain from the "public investigation [and] secret surveillance," Plaintiff resigned from her paid position as Trustee. (*Id.* ¶ 31.) Before she tendered her resignation, Plaintiff asked the Mayor of the Village of Haverstraw why "nobody

was willing to help or support [her]," to which the Mayor allegedly responded that "everybody is afraid of the madman"—i.e., Walsh—and that nobody wanted to "end up like" her.  (*Id.* ¶ 32.) Plaintiff also asserts that, in early November 2021, Rodriguez informed a family friend that Walsh's actions against Plaintiff "were personal and based on [Plaintiff's] refusal to support Walsh as a candidate for District Attorney."  (*Id.* ¶ 33.)  Plaintiff also allegedly learned that "more was coming" for her from Walsh's office, and that Walsh believed that Plaintiff "needed to be in jail."

    2.    The Charges

    In October 2021, Walsh charged Plaintiff, her mother, and her sister with a variety of crimes, including grand larceny under New York Penal Law § 155.30.01 (the "Grand Larceny Charges"), related to allegations that Plaintiff's sister submitted "improper receipts to a not-for-profit corporation" or "otherwise misappropriated funds in order to unlawfully steal funds from the not-for-profit corporation" totaling approximately $11,000.  (*Id.* ¶ 34.)  Plaintiff and her sister subsequently pled guilty to certain of the Grand Larceny Charges, agreeing to pay around $11,000 in restitution and be placed on probation for a five-year period.  (*Id.* ¶ 34 n.1.)  The charges against Plaintiff's mother were dismissed without penalty.  (*Id.*)

    In November 2021, Walsh charged Plaintiff with various crimes relating to allegations that, on November 3, 2020 (Election Day) at the Haverstraw polling location, Plaintiff engaged in: (1) electioneering in violation of N.Y. Election Law § 17-130(4); and (b) unlawfully going within a guard rail at a polling place in violation of N.Y. Election Law § 17-130(6) (together, the "Election Law Charges").  (*Id.* ¶ 35.)  Plaintiff alleges that, upon information and belief, Walsh knew that Plaintiff went to the Haverstraw polling place on Election Day at the request of the Mayor, "because a voting machine was broken, the officials at the polling place were missing

certain ballots, and several of the individuals who were scheduled to work that day at the polling place unexpectedly did not show up for work." (*Id.* ¶ 36.) Plaintiff further alleges that, upon information and belief, Walsh also knew that another Village Trustee went to the polling site to assist with staffing shortages, also at the request of the Mayor. (*Id.* ¶ 37.) Neither the Mayor nor the other Village Trustee were charged with electioneering, unlawfully going within a guard rail, or any of the other crimes related to the Election Law Charges brought against Plaintiff. (*Id.* ¶ 38.)

### 3.  The November 30, 2021, Arrest

On November 30, 2021, Walsh directed Smith and Fitzgerald—both investigators in the Rockland County District Attorney's Office—to arrest Plaintiff based upon the Election Law Charges. (*Id.* ¶¶ 6–7, 39.) Plaintiff alleges that Walsh, Smith, and Fitzgerald knew that Plaintiff would be at the Rockland County Courthouse that day for an appearance on the Grand Larceny Charges. (*Id.* ¶ 40.)

After Plaintiff's appearance on the Grand Larceny Charges was adjourned, a court officer "raised his hand to [Plaintiff's] chest and directed [Plaintiff] to remain in the courtroom" briefly while the others in the courtroom left.[2] (*Id.* ¶¶ 41–42.) The court officer told Plaintiff to leave after a few minutes; then, upon entering the vestibule of the courtroom, Plaintiff was stopped by Smith and Fitzgerald who informed her they had a warrant for her arrest. (*Id.* ¶¶ 43–44.) Smith, who is female, searched Plaintiff's jacket pockets while Fitzgerald, who is male, used both his hands to pat Plaintiff down "by touching and feeling her upper torso, waist, hips, and legs as he stood behind" her. (*Id.* ¶¶ 45–46.) Plaintiff alleges that the pat down was performed by

---

[2] Assistant District Attorneys Jacob B. Sher and Tina Guccione were present in the courtroom at the time and remained there through the events discussed below. (*See id.* ¶¶ 41, 57.)

Fitzgerald, rather than by a female officer per "proper practice," "for the purpose of further humiliating" Plaintiff.  (*Id.* ¶ 47.)

Once the pat down was complete, Fitzgerald "without warning violently grabbed [Plaintiff's] left wrist and violently twisted it behind [Plaintiff's] back, causing [her] extreme pain," and did the same to her right wrist.  (*Id.* ¶¶ 48–49.)  After twisting her arms, Fitzgerald handcuffed Plaintiff's arms behind her back using steel handcuffs, "causing further pain to [Plaintiff's] shoulders and arching [Plaintiff's] neck and spinal cord in an excessive and unnatural position."  (*Id.* ¶ 54.)  When Plaintiff "cried out in pain" and told Fitzgerald he was hurting her, Fitzgerald "re-twisted one of her wrists and further tightened the handcuffs, causing [her] even more pain."  (*Id.* ¶ 55.)  At the same time, Smith—who was standing in front of Plaintiff—"placed one of her hands flat against [Plaintiff's] chest and pushed [Plaintiff's] upper body backward," which "caused a popping sound in [Plaintiff's] upper back and neck."  (*Id.* ¶ 56.)[3]

When Plaintiff asked Fitzgerald and Smith for permission to speak with her sister, who was on the other side of the vestibule, Fitzgerald "violently yank[ed] [Plaintiff's] arms towards him, causing [her] even more needless pain as he forcibly escorted [her] out of the courthouse vestibule."  (*Id.* ¶ 58.)  Plaintiff asked Fitzgerald and Smith to remove the rear handcuffs and handcuff her with her hands in front of her body, due to the "pain and tension in her shoulders and neck," but they refused.  (*Id.* ¶ 59.)  Fitzgerald and Smith took Plaintiff to the Police Department where she was processed and detained until her release from custody (about two

---

[3] At some point during the arrest, Assistant District Attorney Guccione—who was still in the courtroom—opened one of the doors to the vestibule areas, spoke with the arresting officers, and returned to the courtroom.  (*Id.* ¶ 57.)  Guccione did not "intercede or take any steps to stop the physical abuse of [Plaintiff.]"  (*Id.*)

hours later), wherein she was given a Desk Appearance Ticket.  (*Id.* ¶ 62; *see* Decl. of Darius

Chafizadeh, Esq. in Supp. of Partial Mot., Ex. B. ("Chafizadeh Decl.") (Dkt. No. 47-2).)[4]

      After the arrest, Plaintiff continued to experience pain in her shoulder, neck, and chest,

requiring her to go to the hospital where she was informed that she likely experienced "nerve

damage and a tear to a rotor cuff area of her left shoulder."  (*Id.* ¶ 70.)  Plaintiff's condition

worsened, eventually causing her to have surgery on her cervical spine in April 2022.  (*Id.* ¶ 72.)

The surgery did not resolve her pain and numbness, which persist to this day, causing Plaintiff to

require "assistance with basic living functions."  (*Id.* ¶ 74.)

      On or about March 21, 2023, the Election Law Charges—which Plaintiff avers were

"based on false and fabricated claims," (*id.* ¶ 81)—were dismissed, (*id.* ¶ 88).  Plaintiff alleges

that Walsh could have arranged for Plaintiff to appear voluntarily for the Election Law Charges,

thus negating the need for an arrest, but "instead [Walsh] directed Smith and Fitzgerald . . . to

physically and needlessly arrest [Plaintiff] . . . for the vindictive purpose of punishing, harming,

and humiliating [Plaintiff] because she did not support [Walsh] in his 2019 campaign to become

the Rockland County District Attorney."  (*Id.* ¶ 66.)  Plaintiff further alleges that at no point

---

[4] Although generally, "[w]hen considering a motion to dismiss, the Court's review is confined to the pleadings themselves, . . . the Court's consideration of documents attached to, or incorporated by reference in the Complaint, and matters of which judicial notice may be taken, would not convert the motion to dismiss into one for summary judgment."  *Markatos v. Citibank, N.A.*, No. 24-CV-0803, 2024 WL 5154487, at *1 (S.D.N.Y. Dec. 18, 2024).  "[A] a court may incorporate documents referenced where (1) [the] plaintiff relies on the materials in framing the complaint, (2) the complaint clearly and substantially references the documents, and (3) the document's authenticity or accuracy is undisputed."  *Stewart v. Riviana Foods Inc.*, No. 16-CV-6157, 2017 WL 4045952, at *6 (S.D.N.Y. Sept. 11, 2017) (emphasis omitted) (collecting cases). The Third Amended Complaint clearly references the Desk Appearance Ticket (furnished here by Defendants as Exhibit B to the Chafizadeh Declaration) and relies upon said Ticket as part of Plaintiff's allegations.  (*See* TAC ¶¶ 62–63.)  As Plaintiff does not dispute the Exhibit's accuracy, the Court will consider it as incorporated into the Third Amended Complaint by reference.

during the arrest did she "resist arrest or say or do anything that suggested that any physical force was required," (*id.* ¶ 50), and at no point did Fitzgerald or Smith give Plaintiff "the opportunity to comply with any commands or instructions before or after using force" on her, (*id.* ¶ 53).

B. Procedural History

Plaintiff, initially proceeding pro se, filed her Complaint on July 29, 2022, alleging Defendants violated various of her rights under the U.S. Constitution and state law.  (Compl. (Dkt. No. 1).)  Before Defendants responded, Plaintiff filed an Amended Complaint on September 7, 2022.  (Am. Compl. (Dkt. No. 12).)  On November 4, 2022, Defendants submitted a Motion to Dismiss the Amended Complaint (the "First Motion").  (Not. of Mot. (Dkt. No. 15).) After requesting and receiving several extensions, (*see* Dkt. Nos. 18–21), on January 17, 2022, Plaintiff submitted an opposition to Defendants' First Motion, which requested "leave to amend the [C]omplaint to add any new facts from this brief into an [A]mended [C]omplaint and to clarify which federal law claims Plaintiff intends to pursue against which Defendants," (*see* Dkt. No. 22 at 1–2).  Although Defendants opposed the request, (*see* Dkt. No. 25), the Court granted Plaintiff leave to amend and denied Defendants' First Motion as moot, (*see* Dkt. No. 27).

On November 6, 2023, after seeking and receiving an extension of time to file, Plaintiff—now represented by counsel—filed a Second Amended Complaint.  (*See* Dkt. No. 31.) Shortly thereafter, Defendants submitted a letter to the Court requesting permission to file a Partial Motion to Dismiss the Second Amended Complaint.  (*See* Dkt. No. 33.)  In response, on November 27, 2023, Plaintiff asked the Court for leave to again amend the Complaint to clarify the scope of certain allegations asserted against Defendant Walsh.  (*See* Dkt. No. 34 at 1–2.) That same day, the Court directed Plaintiff to file a Third Amended Complaint.  (*See* Dkt. No. 35.)

Plaintiff filed her Third Amended Complaint on December 27, 2023. (*See* Dkt. No. 36.) On January 10, 2024, Defendants filed a letter again requesting permission to file a Partial Motion to Dismiss the Third Amended Complaint. (*See* Dkt. No. 39.) After holding a pre-motion conference on February 21, 2024, the Court issued a briefing schedule, (*see* Dkt. (minute entry for Feb. 21, 2024); Dkt. No. 41), which was later extended upon consent of the Parties, (*see* Dkt. Nos. 44–45).

On April 4, 2024, Defendants submitted their Partial Motion to Dismiss the Third Amended Complaint and accompanying papers. (Not. of Partial Mot. to Dismiss; Chafizadeh Decl.; Defendants' Mem. in Supp. of Partial Mot. ("Defs' Mem.") (Dkt. No. 48).) After requesting and receiving additional time to file, (Dkt. Nos. 49–50), Plaintiff filed her Opposition on April 17, 2024, (Plaintiff's Mem. in Opp'n to Partial Mot. ("Pl's Opp'n") (Dkt. No. 51)). Defendants filed their Reply on June 3, 2024. (Reply in Supp. of Partial Mot. ("Reply") (Dkt. No. 57).)[5]

## II. Discussion

### A. Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of [its] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."

---

[5] Concurrently with the Motion practice, the Parties engaged in discovery on the claims not challenged in the Motion. (*See generally* Dkt.)

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted).  "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement."  *Id.* (alteration and quotation marks omitted).  Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.

Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and "draw[ ] all reasonable inferences in favor of the plaintiff," *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)).  Additionally, as noted, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents

11

appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (citation and quotation marks omitted); *see also Wang v. Palmisano*, 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (same).

B. Analysis

The Third Amended Complaint raises ten claims arising under federal and state law. Those claims include the following:

I.     Excessive and Unreasonable Force and Unreasonable Seizure, under the Fourth and Fourteenth Amendments, (*see* TAC ¶¶ 89–93);

II.    First Amendment Retaliation, (*see id.* ¶¶ 94–97);

III.   Malicious and Fraudulent Prosecution, under the U.S. and New York State Constitutions, (*see id.* ¶¶ 98–103);

IV.   Malicious Abuse of Process, under the U.S. and New York State Constitutions, (*see id.* ¶¶ 104–07);

V.    Selective Prosecution, under the U.S. and New York State Constitutions, (*see id.* ¶¶ 108–11);

VI.   Municipal Liability, under the U.S. and New York State Constitutions, (*see id.* ¶¶ 112–17);

VII.  Assault and Battery, under New York common law, (*see id.* ¶¶ 118–19);

VIII. Malicious Prosecution, under New York common law, (*see id.* ¶¶ 120–21);

IX.   Malicious Abuse of Process, under New York common law, (*see id.* ¶¶ 122–23); and

X.    False Arrest, under New York common law, (*see id.* ¶¶ 124–25).

Defendants move to dismiss: (a) Count One as asserted against Walsh, to the extent that it raises a claim for false arrest under § 1983; (b) Counts Two, Three, Five, Eight, and Ten, to the extent they are asserted against Walsh; and (c) Counts Four and Nine in their entirety. (*See* Defs' Mem. 8–9.) First, Defendants argue that the majority of Plaintiff's claims against Walsh are barred by his absolute prosecutorial immunity. (*See id.* at 14–15.) Second, Defendants assert that Plaintiff's malicious abuse of process claims (Counts Four and Nine) should be dismissed against all Defendants for failure to state a claim. (*See id.* at 16–19.)[6] The Court addresses both of Defendants' arguments as necessary to resolve the instant Motion.

### 1. Absolute Prosecutorial Immunity

Defendants argue that all of Plaintiff's claims against Walsh—apart from Plaintiff's § 1983 excessive force claim (Count One) and state law assault and battery claim (Count Seven)—must be dismissed given the absolute immunity afforded to prosecutors. (*See* Defs' Mem. 14–15; Reply 9–12.) Plaintiff argues, however, that "Walsh's actions were far afield from the judicial process," and thus, he is not entitled to a blanket grant of absolute immunity. (*See* Pl's Opp'n 10–11.)

"Absolute immunity protects a prosecutor not only from liability but also from suit." *Cruz v. Vill. of Spring Valley*, No. 21-CV-2073, 2022 WL 428247, at *3 (S.D.N.Y. Feb. 11, 2022) (quoting *Ogunkoya v. Monaghan*, 913 F.3d 64, 67 (2d Cir. 2019)); *see also Barnett v. City of Yonkers*, No. 15-CV-4013, 2020 WL 2539005, at *4 (S.D.N.Y. May 19, 2020) (same).

---

[6] In their Reply, Defendants also ask the Court to dismiss Plaintiff's excessive force claim (Count One) and state law assault and battery claim (Count Seven) as against Walsh, although Defendants acknowledge they "did not initially move to dismiss" these claims. (Reply 11 n.6.) Because "legal arguments . . . raised for the first time in a reply[] are waived," *Herod's Stone Design v. Mediterranean Shipping Co. S.A.*, 434 F. Supp. 3d 142, 161 (S.D.N.Y. 2020), *aff'd*, 846 F. App'x 37 (2d Cir. 2021), and because Plaintiff has had no opportunity to respond to these new arguments, the Court will not consider them here.

Prosecutors are entitled to absolute immunity from civil suits for damages under § 1983 when "function[ing] as advocates for the state in circumstances intimately associated with the judicial phase of the criminal process." *Bernard v. County of Suffolk*, 356 F.3d 495, 502 (2d Cir. 2004) (citation and quotation marks omitted); *see also Kroemer v. Tantillo*, 758 F. App'x 84, 86–87 (2d Cir. 2018) ("Prosecutorial immunity from § 1983 liability is broadly defined, covering virtually all acts, regardless of motivation, associated with the prosecutor's function as an advocate." (alterations and quotation marks omitted) (*quoting Hill v. City of New York*, 45 F.3d 653, 661 (2d Cir. 1995))). However, not every action performed by a prosecutor is "absolutely immune merely because [it was] performed by a prosecutor." *Cruz*, 2022 WL 428247, at *3 (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993)). Rather, a prosecutor's entitlement to absolute immunity turns on "the capacity in which the prosecutor acts at the time of the alleged misconduct." *Zahrey v. Coffey*, 221 F.3d 342, 346 (2d Cir. 2000). Thus, to determine whether a prosecutor's conduct is entitled to absolute immunity, courts apply "a functional approach, which looks to the nature of the function performed [by the prosecutor], not the identity of the actor who performed it." *Buckley*, 509 U.S. at 269 (citations and quotation marks omitted); *see also Van de Kamp v. Goldstein*, 555 U.S. 335, 342 (2009) (noting that courts "must take account of . . . 'functional' considerations" in deciding "whether absolute immunity attaches to a particular kind of prosecutorial activity" (citations omitted)). The defendant "claiming immunity bears the burden of showing that the particular immunity claimed applies." *Giraldo v. Kessler*, 694 F.3d 161, 165 (2d Cir. 2012); *Norton v. Town of Islip*, 97 F. Supp. 3d 241, 254 (E.D.N.Y. 2015) (same).

"It is clear that 'the initiation and pursuit of a criminal prosecution are quintessential prosecutorial functions' covered by absolute immunity." *Cruz*, 2022 WL 428247, at *4 (quoting

*Shmueli v. City of New York*, 424 F.3d 231, 237 (2d Cir. 2005)); *see also Hill*, 45 F.3d at 661 (noting that absolute immunity covers such acts as "initiating a prosecution and presenting the case" in court proceedings (citations omitted)).  Also covered is prosecutors' "professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury after a decision to seek an indictment has been made." *Buckley*, 509 U.S. at 273.  Absolute immunity even protects "the knowing presentation of perjured testimony to a grand jury, without any prosecutorial involvement in its earlier inducement." *Bernard*, 356 F.3d at 506 (citation omitted); *see also Hill*, 45 F.3d at 661 (noting that prosecutors are "immune for conduct in preparing for [prosecutorial] functions," including "evaluating and organizing evidence for presentation at trial or to a grand jury, or determining which offenses are to be charged" (citations omitted)).  Furthermore, a prosecutor's motives for actions that are deemed to be within his or her role as an advocate are irrelevant for purposes of absolute immunity.  *See Shmueli*, 424 F.3d at 237–38 (holding that absolute immunity is "not affected by allegations that improperly motivated prosecutions were commenced or continued pursuant to a conspiracy"); *Bernard*, 356 F.3d at 503 (holding that "once a court determines that challenged conduct involves a function covered by absolute immunity, the actor is shielded from liability for damages regardless of the wrongfulness of his motive or the degree of injury caused" (citation omitted)).

By contrast, "[w]hen a [prosecutor] functions outside his or her role as an advocate for the People, the shield of [absolute] immunity is absent." *Hill*, 45 F.3d at 661.  Specifically, "[w]hen a prosecutor performs the investigative functions normally performed by a detective or police officer, it is neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other." *Buckley*, 509 U.S. at 273 (citation and quotation marks

omitted); *see also Smith v. Garretto*, 147 F.3d 91, 94 (2d Cir. 1998) ("[W]hen a prosecutor . . . performs the investigative functions normally performed by a detective or police officer, he is eligible only for qualified immunity." (citations and quotation marks omitted)).  In determining whether a prosecutor is functioning within a prosecutorial or an investigative role, courts must look to the prosecutor's general "role and function in an ongoing proceeding," and will reach a determination based "chiefly on whether there is pending or in preparation a court proceeding in which the prosecutor acts as an advocate." *Ogunkoya*, 913 F.3d at 70 (citation and quotation marks omitted).

Finally, "[d]istrict courts are encouraged to determine the availability of an absolute immunity defense at the earliest appropriate stage, and preferably before discovery . . . because an absolute immunity defeats a suit at the outset, so long as the official's actions were within the scope of the immunity." *Burton v. County of Westchester*, 21-CV-1475, 2022 WL 2340478, at *4 (S.D.N.Y. June 29, 2022) (quoting *Hutchins v. Solomon*, No. 16-CV-10029, 2018 WL 4757970, at *23 (S.D.N.Y. Sept. 29, 2018)).  "However, the Second Circuit has held that, 'when it may not be gleaned from the complaint whether the conduct objected to was performed by the prosecutor in an advocacy or an investigatory role, the availability of absolute immunity from claims based on such conduct cannot be decided as a matter of law on a motion to dismiss.'" *Varricchio v. County of Nassau*, 702 F. Supp. 2d 40, 65 (E.D.N.Y. 2010) (quoting *Hill*, 45 F.3d at 663).

The ultimate question thus is whether Walsh's actions, as alleged in the Third Amended Complaint, were performed in an advocacy capacity or in some other non-advocacy capacity. The Court considers the allegations in turn.

First, Plaintiff alleges that Walsh initiated the Election Law Charges against her even though he knew they were "based on false and fabricated claims" and that "there [was] no basis" for them. (*See* TAC ¶¶ 81–83, 100.) To the extent Plaintiff's claims are based on allegations that Walsh initiated the prosecution against her without probable cause or based on false evidence, Walsh is immune from such claims, because, as discussed above, it is well established that "the initiation and pursuit of a criminal prosecution are quintessential prosecutorial functions" covered by absolute immunity. *Shmueli*, 424 F.3d at 237 (citing *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)); *see also Hill*, 45 F.3d at 661 (noting that absolute immunity covers such acts as "initiating a prosecution and presenting the case" in court proceedings (citations omitted)). This includes the deliberate choice to move forward and prosecute an individual for crimes that a prosecutor knew the accused was "innocent of committing," as such decision is based on "functions for which a prosecutor is normally accorded absolute immunity." *Shmueli*, 424 F.3d at 238 (holding that prosecutors were entitled to absolute immunity from allegations they "maliciously prosecuted [plaintiff] for various crimes, all of which they knew she was innocent of committing"); *see also Harrison v. County of Nassau*, No. 15-CV-2712, 2016 WL 4083381, at *4 (E.D.N.Y. Aug. 1, 2016) (noting absolute immunity applies "even where the prosecutor knowingly prosecutes an innocent person"); *cf. Bernard*, 356 F.3d at 506 (holding that absolute immunity protects even "the knowing presentation of perjured testimony to a grand jury, without any prosecutorial involvement in its earlier inducement" (citation omitted)). Thus, that Walsh allegedly brought the Election Law Charges against Plaintiff knowing they were based on "false and fabricated" evidence, (TAC ¶ 80), is not enough to defeat the Motion.

Nor does it matter that Walsh's decision to initiate the prosecution was, as Plaintiff argues, wholly "vindictive." (Pl's Opp'n 9.) The Supreme Court has made clear that because a

17

prosecutor "is absolutely immune from liability for the decision to prosecute," an "action for retaliatory prosecution will not be brought against the prosecutor." *Hartman v. Moore,* 547 U.S. 250, 261–62 (2006) (internal citation omitted); *see also Alvarez v. Doe*, No. 03-CV-7740, 2004 WL 1874972, at *4 (S.D.N.Y. Aug. 13, 2004) ("A prosecutor . . . has absolute immunity in connection with the decision whether or not to commence a prosecution.").  Accordingly, even accepting as true that Walsh initiated Plaintiff's Election Law prosecution solely because he wished to retaliate against her for supporting his political rival, as troubling as that may be, Walsh is still absolutely immune from liability from such claims.  *See D'Alessandro v. City of New York*, 713 F. App'x 1, 5 (2d Cir. 2017) (summary order) ("[A] prosecutor still acts within the scope of [his] duties even if []he engages in malicious prosecution."); *Shmueli*, 424 F.3d at 237–38 (absolute immunity is "not affected by allegations that improperly motivated prosecutions were commenced or continued pursuant to a conspiracy"); *Bernard*, 356 F.3d at 503 (holding absolute immunity applied to plaintiff's claim of "malicious and selective prosecution based on [the prosecutor's decision] . . . to seek indictments despite the lack of probable cause," because that conduct "lie[s] at the very core of a prosecutor's role as an advocate engaged in the judicial phase of the criminal process" (collecting cases)); *see also Anilao v. Spota*, 774 F. Supp. 2d 457, 480 (E.D.N.Y. 2011) (holding absolute immunity "shielded [defendants] from liability for their decision to prosecute [plaintiff] in retaliation for exercising his First Amendment rights," because a prosecutor is "absolutely immune from liability for the decision to prosecute" (internal quotation marks omitted)), *aff'd*, 27 F.4th 855 (2d Cir. 2022).

    The same logic applies to the conduct that Plaintiff alleges occurred *after* the Election Law prosecution was begun—specifically, that Walsh "vindictively misused and abused the

powers of his office to arrange for the brutal arrest of [Plaintiff]." (TAC ¶ 63; *id.* ¶¶ 90–92; *see also* Pl's Opp'n 8 (arguing Walsh is not entitled to immunity for "direct[ing] police officers to arrest [Plaintiff] on bogus 'electioneering' charges").) Indeed, as Defendants note, (Defs' Mem. 13), courts have found that prosecutors are entitled to absolute immunity for directing arrests after a prosecution was initiated, *see Kravtchouk v. City of New York*, No. 16-CV-4787, 2019 WL 4918083, at *5 (E.D.N.Y. Sept. 30, 2019) (finding that a prosecutor's "alleged actions in investigating and reviewing [plaintiff's] records, and in subsequently directing his arrest and prosecution on false filing charges, fall within the reasonable functions of a prosecutor"); *see Ramirez v. Port Auth. of New York & New Jersey (PANYNJ)*, No. 15-CV-3225, 2015 WL 9463185, at *4 n.11 (S.D.N.Y. Dec. 28, 2015) (holding that prosecutors were "entitled to absolute immunity" for false arrest and malicious prosecution claims "because all of their alleged misconduct occurred as they were carrying out their core prosecutorial functions"). Accordingly, Walsh is absolutely immune to the extent Plaintiff alleges he directed her arrest for the Election Law Charges.

The remainder of Plaintiff's allegations, however—those detailing Walsh's investigatory conduct *before* the Election Law prosecution was initiated—cannot be dealt with so easily. Specifically, Plaintiff alleges that Walsh: (1) "issu[ed] at least a dozen subpoenas to local officials and agencies, telephone carriers, and private business and banks" to obtain information about Plaintiff, *not* "to provide evidence to a grand jury reviewing specific charges," (TAC ¶ 24); (2) obtained Plaintiff's tax returns to "use" against her, (*id.* ¶ 21); (3) asked Bueno, another Village Trustee, for "dirt" on Plaintiff and threatened Bueno if he attempted to assist Plaintiff, (*id.* ¶¶ 25–26); (4) by August 2021, had Plaintiff and her family put under "constant surveillance" to "find any kind of dirt" on her, (*id.* ¶ 27); (5) had law enforcement working for

him "put[] a nail into one of [Plaintiff's] car tires," (*id.* ¶ 29); and (6) had law enforcement execute a search warrant for, and seize, Plaintiff's cell phone, (*id.* ¶ 30).

Accepting these allegations as true, it is not apparent from the face of the Third Amended Complaint whether Walsh is entitled to immunity for these actions.  There are no allegations in the Third Amended Complaint as to when a grand jury was empaneled or when, specifically, Plaintiff was indicted with either the Grand Jury or Election Law Charges.  (*See generally* TAC.) If Walsh undertook many of the alleged investigatory actions described above *before* any probable cause existed and *before* making the decision to initiate a prosecution, immunity may not apply.  *See, e.g.*, *Galgano v. County of Putnam*, No. 16-CV-3572, 2024 WL 1623401, at *62 (S.D.N.Y. Apr. 15, 2024) (noting that prosecutors "were protected by absolute immunity for their evaluation of the evidence and subsequent decisions to indict [p]laintiff," but were "not entitled to prosecutorial immunity for submitting affidavits and applications in support of [certain] warrants" (internal quotation marks omitted) (alterations adopted)); *Anilao*, 774 F. Supp. 2d at 482 (declining to apply absolute immunity on a motion to dismiss for alleged investigatory conduct taken by a prosecutor where "the investigation was conducted entirely by the County defendants and not the police"); *Conte v. County of Nassau*, No. 06-CV-4746, 2010 WL 3924677, at *11 (E.D.N.Y. Sept. 30, 2010) (holding prosecutors were "not entitled to absolute immunity for their investigative conduct" where "there was no evidence of any police involvement in this case" but instead, the prosecutor's office "investigated [the] complaint on its own before any probable cause determination and before the initiation of any criminal proceedings"); *see also Bertuglia v. City of New York*, 839 F. Supp. 2d 703, 732 (S.D.N.Y. 2012) (noting that, "to the extent that the [prosecutors] conducted interviews or issued subpoenas 'without any colorable claim of authority,' then they would not be entitled to absolute immunity

20

even when functioning as advocates"); *id.* at 731 (citing authority suggesting that "subpoenas issued before a grand jury is convened come under the 'investigative' rather than 'advocacy' function of a prosecutor, and are therefore not entitled to absolute immunity").

Defendants do not argue that Walsh's alleged investigatory actions should be considered as performed in his capacity as an advocate rather than an investigator. Instead, they assert that Walsh's investigatory actions have "no relationship whatsoever to the Election Law Charges based on Plaintiff's alleged actions on November 3, 2020, but rather [are] directed towards the Grand Larceny Charges prosecuted against Plaintiff." (Reply 8.) Specifically, Defendants argue that because much of the investigatory conduct alleged in the Third Amended Complaint must have happened *before* November 2020, when the conduct forming the basis of the Election Law Charges allegedly occurred, it could not possibly be related to the Election Law Charges forming the basis of Plaintiff's claims and thus, Walsh cannot be liable for them. (*See id.*)

Defendants are correct that Plaintiff only asserts claims based upon the Election Law Charges. (*See generally* TAC.)[7] However, the Third Amended Complaint does not spell out so neat a distinction between actions relating to investigation of the Grand Larceny Charges and actions relating to investigation of the Election Law Charges. Instead, Plaintiff alleges a pattern of misconduct and harassment potentially divorced from, or alternatively encompassing, *both* investigations. For instance, Plaintiff alleges that, "[f]rom the summer of 2020 and *continuing*

---

[7] Further, as Defendants correctly point out, insofar as Plaintiff's allegations are based on conduct related solely to the Grand Larceny Charges, granting relief on such claims "would require finding that the prosecutor acted without legal authority [and] without probable cause," which "would necessarily impugn the validity of Plaintiff's conviction." *See Zarro v. Spitzer*, 274 F. App'x 31, 34 (2d Cir. 2008). Because any claims implicating the validity of Plaintiff's Grand Larceny conviction are not cognizable under § 1983 and instead, must be brought in habeas, *see Heck v. Humphrey*, 512 U.S. 477, 487 (1994), the Court would not be able to consider those allegations here.

*throughout 2021*," Walsh "launch[ed] a broad investigation into all facets of [Plaintiff's] person, business, and political affairs." (TAC ¶ 24 (emphasis added).)  As Defendants themselves concede, at least to certain allegations, the Third Amended Complaint does not distinguish between conduct related to the Grand Larceny Charges and conduct related to the Election Law Charges. (*See* Reply 10 (acknowledging that "Plaintiff does not differentiate between the subpoenas that may have been issued related to the Grand Larceny Charges (before and/or after Election Day 2020) or subpoenas related to the Election Law Charges"); *see also* TAC ¶¶ 26–31 (alleging misconduct occurring through 2021).)  Thus, it is not apparent from the face of the Third Amended Complaint that all of Walsh's investigatory actions are solely related to the Grand Larceny Charges, rather than the Election Law Charges forming the basis of Plaintiff's claims.[8]

---

[8] To the extent that Defendants attempt to bootstrap Walsh's immunity for his later decision to bring the Election Law Charges to demonstrate his immunity for his prior investigatory actions, they are incorrect. Indeed, caselaw is "clear that the same prosecutor may enjoy absolute immunity for later, prosecutorial activity, while lacking such immunity with respect to earlier, non-prosecutorial activity in the same case." *See Galgano v. County of Putnam*, No. 16-CV-3572, 2020 WL 3618512, at *8 (S.D.N.Y. July 2, 2020); *see also Kalina v. Fletcher*, 522 U.S. 118, 129–31 (1997) (explaining that a prosecutor's "activities in connection with the preparation and filing of two of the three charging documents—the information and the motion for an arrest warrant—are protected by absolute immunity," but concluding that her execution of a certification of determination of probable cause "under penalty of perjury" was not so protected). For instance, courts have regularly held prosecutors liable for fabricating evidence in advance of criminal proceedings—even where the same prosecutors subsequently prosecuted the plaintiff. *See, e.g.*, *Hill*, 45 F.3d at 662 (explaining that prosecutors' manufacturing of evidence "in order to get probable cause" was not protected by absolute immunity, despite later prosecutorial conduct before a grand jury); *Liffiton v. Keuker*, 850 F.2d 73, 77–78 (2d Cir. 1988) (denying absolute immunity to defendant prosecutors who submitted allegedly false affidavits in support of an application for a wiretap, while acknowledging that they would be entitled to immunity for later misuse of the grand jury process). In other words, the simple fact that Walsh allegedly capitalized on his investigative misconduct to engage in further prosecutorial misconduct does not entitle him to rely on the latter to immunize the former. *See Buckley*, 509 U.S. at 275–76 ("That the prosecutors later called a grand jury to consider the evidence this work produced does not retroactively transform that work from the

Accordingly, although the Court is cognizant that the issue of absolute immunity should be resolved at the earliest possible stage of the litigation, *see Burton*, 2022 WL 2340478, at *4, given the investigative misconduct alleged in the Third Amended Complaint, the Court declines to rule as a matter of law that Walsh is absolutely immune from liability for investigating Plaintiff, *see Hill*, 45 F. 3d at 663 ("[W]hen it may not be gleaned from the complaint whether the conduct objected to was performed by the prosecutor in an advocacy or an investigatory role, the availability of absolute immunity from claims based on such conduct cannot be decided as a matter of law on a motion to dismiss."); *see also Bertuglia*, 839 F. Supp. 2d at 732 (declining, based on allegations of investigative misconduct, to decide whether absolute immunity applied as a matter of law on a motion to dismiss); *Anilao*, 774 F. Supp. 2d at 485 (declining to decide absolute immunity on a motion to dismiss because it was "not clear from the current record that a Grand Jury had even been empanelled [sic] at the time the [defendants] . . . opened their investigation of plaintiffs"). Walsh is entitled to renew this argument at the summary judgment stage. As to the remainder of Plaintiff's allegations, as discussed above, the Court finds that they pertain solely to activity undertaken in Walsh's advocacy role and thus, Walsh is entitled to absolute immunity insofar as Plaintiff's claims stem from those allegations.

---

administrative into the prosecutorial."); *Zahrey*, 221 F.3d at 353 (explaining that "a subsequent immunized act of a single official does not break the chain of causation traceable to his initial misconduct occurring in another capacity" and that the fact that an official's absolutely immune conduct "may have been the means by which he initiated the prosecution does not permit him to transpose the immunity available for defamation as a defense to malicious prosecution" (citation and quotation marks omitted)).

Similarly, courts have held that malicious prosecution claims against prosecutors can still proceed when based on the prosecutor's non-prosecutorial conduct. *See, e.g.*, *Galgano*, 2020 WL 3618512, at *8 n.7 (finding no absolute immunity where plaintiff "does not seek to hold [the prosecutors] personally liable for making [formal prosecutorial decisions]; rather he seeks to hold them liable for their *prior*, investigative conduct . . . that caused and enabled the prosecutorial decisions."); *id.* (collecting cases).

2. Abuse of Process

Next, Defendants argue that Plaintiff's malicious abuse of process claims (Counts Four and Nine) should be dismissed against all Defendants for failure to state a claim. (Defs' Mem. 16–19.) The Court agrees.

"In order to establish liability for malicious abuse of process under § 1983, a plaintiff must establish the claim's elements under state law as well as the deprivation of a constitutional right." *Barkai v. Nuendorf*, No. 21-CV-4060, 2023 WL 2691712, at *35 (S.D.N.Y. Mar. 29, 2023) (quoting *Hoffman v. Town of Southampton*, 893 F. Supp. 2d 438, 446 (E.D.N.Y. Sep. 28, 2012), *aff'd*, 523 F. App'x 770 (2d Cir. 2013)). Under New York law, a plaintiff may assert an abuse of process claim against a defendant who "(1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Savino v. City of New York*, 331 F.3d 63, 76 (2d Cir. 2003) (quoting *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994)).

As Defendants argue, Plaintiff's claim falters in the third and final element of the claim—often referred to as "[t]he crux of a malicious abuse of process claim," *Kraft v. City of New York*, 696 F. Supp. 2d 403, 416 (S.D.N.Y. 2010), *aff'd*, 441 F. App'x 24 (2d Cir. 2011)—the collateral objective. To plead a collateral objective, a plaintiff must plausibly plead not that defendant acted with an "improper motive," but rather an "improper purpose." *Savino*, 331 F.3d at 77; *see also Lopez-Motherway v. City of Long Beach*, No. 20-CV-5652, 2021 WL 965158, at *4 (E.D.N.Y. Mar. 15, 2021) ("To establish a collateral objective, a plaintiff must prove that the defendants 'acted not merely with an improper motive, but to achieve an improper purpose.'" (quoting *Scott v. City of New York*, No. 16-CV-834, 2020 WL 208915, at *12 (E.D.N.Y. Jan. 14,

2020))).  In other words, "it is not sufficient for a plaintiff to allege that the defendants were

seeking to retaliate against him by pursuing his arrest and prosecution.  Instead, [the plaintiff]

must claim that they aimed to achieve a collateral purpose *beyond or in addition to* his criminal

prosecution."  *Savino*, 331 F.3d at 77 (emphasis added); *see also Wetzel v. Town of Orangetown*,

No. 06-CV-6117, 2010 WL 743039, at *5 (S.D.N.Y. Mar. 2, 2010) ("New York Courts have

made clear that a malicious motive alone[] does not give rise to a cause of action for abuse of

process.").

 Simply put, Plaintiff has failed to plausibly allege a collateral objective.  Plaintiff alleges

that Walsh's collateral objective was "retribution against [Plaintiff] and silencing and

discrediting Walsh's enemies, such as [Plaintiff], who he perceive[s] as persons willing or able to

disclose information about Walsh's personal misconduct."  (TAC ¶ 106.)  But as the Second

Circuit made clear in *Savino*, merely alleging a retaliatory motive is insufficient, on its own, to

demonstrate a collateral purpose.  331 F.3d at 77; *see, e.g.*, *Cabello-Setlle v. Scott*, No. 21-CV-

7477, 2024 WL 308212, at *4 (S.D.N.Y. Jan. 26, 2024) ("[A] retaliatory motive is insufficient to

state a claim for abuse of process"); *Rodriguez v. Vill. of Sleepy Hollow*, No. 13-CV-8465, 2015

WL 4597446, at *8 (S.D.N.Y. July 29, 2015) ("Plaintiffs fail to state that [d]efendants had any

collateral intent to issue and prosecute the appearance tickets beyond political retribution.  As

retaliation does not suffice as a collateral motive, [p]laintiffs fail to establish the third element of

an abuse of process claim."); *Peter L. Hoffman, Lotte, LLC v. Town of Southampton*, 523 F.

App'x 770, 771 (2d Cir. 2013) ("Neither retaliation nor a malicious motive, however, is a

sufficient collateral objective to satisfy that element of a cognizable malicious abuse of process

claim.").[9]  Similarly, it is not enough to allege that Walsh intended to "silence" Plaintiff without also alleging a purpose beyond or in addition to the prosecution.  *See Lepper v. Vill. of Babylon*, No. 18-CV-7011, 2022 WL 939719, at \*22–23 (E.D.N.Y. Mar. 29, 2022) (finding plaintiff's claim that defendants "issued legal process to silence the [p]laintiffs" insufficient as a matter of law to survive summary judgment on an abuse of process claim), *aff'd sub nom. Lepper v. Scordino*, No. 22-1064, 2023 WL 4004220 (2d Cir. June 15, 2023); *see also Crews v. County of Nassau*, 2007 WL 4591325, \*12 (E.D.N.Y. 2007) ("Because plaintiffs have merely alleged that defendants were motivated by their desire to cover up their misdeeds, but not that defendants had a purpose other than to prosecute [plaintiff], the abuse of process claim fails.").[10]

---

[9] Plaintiff claims that alleging a retaliatory motive is "sufficient under the law" to make out an abuse of process claim, citing as her only authority for that proposition a Second Circuit case from 1994 and this Court's opinion in *Burton*.  (*See* Pl's Opp'n 17–18 (citing *Burton*, 2022 WL 2340478, at \*6, and *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994)).)  In *Burton*, the Court quoted caselaw stating "[e]xamples of collateral objectives can include infliction of economic harm, extortion, blackmail or retribution."  2022 WL 2340478, at \*6 (quoting *Wagner v. Hyra*, No. 19-CV-4, 2021 WL 475331, at \*8 (N.D.N.Y. Feb. 10, 2021) (internal quotations omitted)).  Plaintiff overlooks, however, that this Court in *Burton* then went on to *reject* plaintiff's alleged collateral objective—i.e., that defendant was "punishing [p]laintiff"—as insufficient to make out a claim.  *Id.* at \*5–6.

Moreover, the language *Burton* quoted in dicta comes from a line of cases going to a 1975 case from the Court of Appeals of New York, which is not binding on this Court, *see Bd. of Ed. of Farmingdale Union Free Sch. Dist. v. Farmingdale Classroom Tchrs. Ass'n, Inc., Loc. 1889 AFT AFL-CIO*, 38 N.Y.2d 397, 404 (1975) ("Where process is manipulated to achieve some collateral advantage, whether it be denominated extortion, blackmail or retribution, the tort of abuse of process will be available to the injured party."); *see also Wagner*, 518 F.Supp.3d at 632 (quoting *Dash v. Montas*, 612 F. Supp. 3d 138, 154 (E.D.N.Y. 2020)); *Dash*, 612 F. Supp. 3d at 154 (quoting *Brandon v. City of New York*, 705 F. Supp. 2d 261, 275 (S.D.N.Y. 2010)); *Brandon*, 705 F. Supp. at 275 (quoting *Bd. of Ed. Of Farmingdale*)), and as discussed above, the Second Circuit has made clear that retaliation alone is insufficient to make out an abuse of process claim, *Savino*, 331 F.3d at 77; *Peter L. Hoffman, Lotte, LLC*, 523 F. App'x at 771.

[10] Read generously, Plaintiff could be attempting to allege that Walsh's purpose—i.e., silencing and discrediting Plaintiff—was done to protect his reputation and even possibly his employment.  (*See* TAC ¶ 106 (alleging Walsh abused legal process to "silenc[e] and discredit[] . . . persons willing or able to disclose information about Walsh's personal misconduct").)  Some courts have noted that the protecting one's employment can be a sufficient collateral objective to

Accordingly, Defendants' Motion is granted with respect to Plaintiff's abuse of process claims (Count Four and Count Nine).

## II. Conclusion

For the foregoing reasons, Defendants' Motion is denied in part and granted in part. In summary, Walsh is entitled to absolute immunity on all claims against him—with the exception of Count One, to the extent it asserts an excessive force claim, and Count Seven—insofar as such claims are based on allegations related to his decision to initiate and conduct the Election Law prosecution against Plaintiff. The Court declines to find Walsh absolutely immune for all other claims insofar as they are based on Walsh's allegedly investigatory actions prior to the initiation of said prosecution.

The Court grants Defendants' Motion as to Counts Four and Nine, which are dismissed as to all Defendants. The Court's dismissal of these Counts is without prejudice because this is the first adjudication of Plaintiff's claims on the merits.

If Plaintiff wishes to file an amended complaint alleging additional facts and otherwise addressing the deficiencies identified above, Plaintiff must do so within thirty days of the date of

---

make out an abuse of process claim. *See Douglas v. City of New York*, 595 F. Supp. 2d 333, 344 (S.D.N.Y. 2009) ("Fabricating assault charges to save one's job could be abuse of process, however, because 'safeguarding one's own employment lies outside the legitimate goal of criminal process'" (quoting *Hernandez v. Wells,* 01-CV-4376, 2003 WL 22771982, at *9 (S.D.N.Y. Nov. 18, 2003)). However, in such cases, there was evidence that the defendant believed they were in genuine danger of losing their job. *See Hernandez*, 2003 WL 22771982, at *9 (finding that "sav[ing] [defendant's] own job" satisfied collateral objective element where defendant "had been told that he would be fired if he violated any rules or regulations at any time in the future"). Plaintiff does not allege facts sufficient to support such an inference here. *See Jovanovic v. City of New York*, No. 04-CV-8437, 2010 WL 8500283, at *9–10 (S.D.N.Y. Sept. 28, 2010) (finding, on summary judgment, that there was insufficient evidence to support an collateral objective of "protecting one's job," as there was "no evidence that [defendant] believed he could lose his job"), *aff'd*, 486 F. App'x 149 (2d Cir. 2012); *see also Douglas,* 595 F. Supp. 2d at 344 (same).

this Opinion & Order.  *See Tyson v. Town of Ramapo*, No. 17-CV-4990, 2019 WL 1331913, at

*19 (S.D.N.Y. Mar. 25, 2019) ("The Court will afford Plaintiff an opportunity to amend if, after

reviewing this Order and Opinion and the law therein, he still believes that he can plausibly state

claims against Defendants." (alteration adopted) (citation omitted)).  There will be no extensions.

Plaintiff is further advised that an amended complaint will completely replace, not supplement,

the Third Amended Complaint.  Any amended complaint must therefore contain *all* of the

claims, defendants, and factual allegations that Plaintiff wishes the Court to consider.  If Plaintiff

fails to timely file an amended complaint, the dismissed claims may be dismissed with prejudice.

     The Court will hold a telephonic conference on April 8, 2025, at 2:00 PM ET.

     The Clerk of Court is respectfully directed to terminate the pending Motion.  (Dkt.

No. 46.)

SO ORDERED.

DATED:     February 26, 2025
           White Plains, New York

                                    _____
                                      KENNETH M. KARAS
                                      UNITED STATES DISTRICT JUDGE