UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EMILY DOMINGUEZ,<br><br>*Plaintiff*,<br><br>v.<br><br>THOMAS E. WALSH, II, DEIRDRE SMITH *a/k/a* DEIRDRE SMITH WITHERS, CONOR FITZGERALD, *and* ROCKLAND COUNTY, NEW YORK,<br><br>*Defendants*. | No. 22-CV-6443 (KMK)<br><br><u>OPINION & ORDER</u> |

<u>Appearances</u>:

Nathaniel B. Smith, Esq.
New York, NY
*Counsel for Plaintiff*

John David Lenoir, Esq.
New Canaan, CT
*Counsel for Plaintiff*

Darius Patrick Chafizadeh, Esq.
Mathew Thomas Dudley, Esq.
Harris Beach Murtha Cullina PLLC
White Plains, NY
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

Emily Dominguez ("Plaintiff") brings this Action against Thomas E. Walsh, II ("Walsh"), Deirdre Smith ("Smith"), Conor Fitzgerald ("Fitzgerald") (collectively, the "Individual Defendants"), and Rockland County (the "County," and together with the Individual Defendants, "Defendants"), seeking compensatory and punitive damages, declaratory judgment, and attorney's fees for asserted violations of her Fourth and Fourteenth Amendment rights to be free from unreasonable searches and seizures, her First Amendment right to free speech, and her

Case 7:22-cv-06443-KMK-VR Document 108 *SEALED* Filed 10/30/25 Page 2 of 70

rights to be free from malicious prosecution, selective prosecution, and abuse of process, pursuant to 42 U.S.C. § 1983 as well as certain analogous rights under the New York State Constitution. (*See generally* Fourth Amended Complaint ("FAC") ¶¶ 4–8, 94–134 (Dkt. No. 85).)[1] After the close of discovery, Defendants moved for summary judgment on a subset of Plaintiff's claims. (Mot. for Partial Summ. J. (Dkt. No. 94).) For the reasons set forth below, Defendants' Motion is granted, except insofar as it sought dismissal of state law claims that corresponded to the federal claims for which the Defendants did not seek summary judgment. For reasons explained in Section II.B.10, *infra*, these claims may be viable against the County on a theory of respondeat superior that is unavailable under Section 1983.

## I. Background

### A. Factual Background

The following facts are taken from the Parties' statements and counterstatements of facts pursuant to Rule 56.1 and are undisputed unless otherwise noted. (*See* Defs.' Rule 56.1 Statement ("Defs.' 56.1") (Dkt. No. 96); Pl.'s Rule 56.1 Statement ("Pl.'s 56.1") (Dkt. No. 102).) Facts within the Parties' 56.1 statements that are not contradicted by citations to admissible evidence are deemed admitted. *See Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003).

#### 1. Plaintiff and Walsh's Acquaintance

Plaintiff and Defendant Walsh met in the 1990s, when Plaintiff's mother, an organizer in Rockland County, was campaigning on his behalf. (Pl.'s 56.1 ¶ 11.) Decades later, from 2007

---

[1] When citing materials filed by the Parties, the Court relies on the page numbers as designated on the documents themselves. When the documents are not paginated, the Court cites page numbers generated by the Court's Electronic Case Filing System, which appear at the top-right corner of each page.

through September 2021, Plaintiff served as a Village Trustee and Deputy Mayor of the Village of Haverstraw in Rockland County. (*Id.* ¶ 1.) During that time, and specifically from 2010 through 2020, Plaintiff and Defendant Walsh were acquaintances, though not particularly close, and would see each other at local political, non-profit, and charitable events. (*Id.* ¶¶ 3, 13.)

In 2019, Defendant Walsh was campaigning for reelection as District Attorney in Rockland County. (*See id.* ¶ 4.) Plaintiff and her family backed his opponent. (*Id.* ¶¶ 4, 14.) Their allegiance shifted, according to Plaintiff, due to allegations that Defendant Walsh and other elected officials were traveling to the Dominican Republic and engaging in sexual misconduct. (*Id.* ¶ 18.) However, Plaintiff never told Defendant Walsh the reason she did not endorse him. (*Id.* ¶ 26.) It is disputed when Defendant Walsh became aware that Plaintiff and her family endorsed his opponent.[2]

As retaliation for the non-endorsement, Plaintiff claims that Walsh sought to destroy her career and, among other things, obtain her tax returns to use against her. (Pl.'s 56.1 ¶¶ 139–40.) She asserts that that Walsh disclosed these plans to others and they were relayed to her. (*Id.* ¶¶ 140–151.) However, Plaintiff points to no admissible evidence that would support the

---

[2] Despite the non-endorsement, Defendant Walsh claims he was not aware that Plaintiff and her family had supported his opponent. (Pl.'s 56.1 ¶ 4.) Plaintiff responds that this was "common knowledge within the Village of Haverstraw," not only because she was a local public official, but also because her mother was a "long-time political organizer" for the Hispanic community in Haverstraw. (*Id.*) She asserts that by the time of the 2019 primary, it was "common knowledge" that she and her mother were actively supporting Walsh's opponent. (Decl. of Emily Dominguez in Opp'n ("Pl.'s Decl.") ¶ 7 (Dkt. No. 101).) On this point, it bears noting that Plaintiff and her mother received a letter in the mail from Walsh regarding his campaign. (Pl.'s 56.1 ¶ 15.) That letter addresses Plaintiff's mother by her first name ("Luz") and while it appears somewhat generic, it also specifies that Walsh "look[ed] forward to coming to [Plaintiff's mother's political] convention on February 21st[,] [2019] to speak with [her] and share [Walsh's] vision for the future of the District Attorney's office." (Decl. of Nathaniel B. Smith in Opp'n re: Mot. for Partial Summ. J., Ex. 4 (Dkt. No. 103-4).) It also indicates that Walsh was "asking for [her] support" in the election. (*Id.*)

conclusion that these disclosures ever occurred, and so the Court is not obligated to credit their existence in deciding the Motion for Summary Judgment. *See Kindle v. Dejana*, 238 F. Supp. 3d 353, 358 n.2 (E.D.N.Y. 2017) ("If a statement of fact is premised entirely upon inadmissible evidence—hearsay, for example—it is disregarded. If a proffered fact that is supported by admissible evidence is disputed only with inadmissible or irrelevant evidence, the Court treats that fact as undisputed." (citing, among other sources, *Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010)).[3]

Plaintiff likewise claims that, as part of the campaign of retaliation, Defendant Walsh asked another Village Trustee for "dirt" on her. (Pl.'s 56.1 ¶¶ 146–51.) Plaintiff's allegations

---

[3] To wit: Plaintiff claims that Defendant Walsh and his significant other, Zahira Rodriguez ("Rodriguez"), told Town of Haverstraw Town Councilman, Johnny Ortiz, "that they had plans to destroy [Plaintiff's] political career." (Pl.'s 56.1 ¶ 139.) Ortiz executed an affidavit denying these allegations. (Decl. of Darius Chafizadeh, Esq. in Supp. re: Mot. for Partial Summ. J., Ex. UU ¶ 4 (Dkt. No. 95-47) ("The allegation . . . is not true. It is a lie."); *see also id.* ¶¶ 5–8 (stating that any such conversations never occurred, and neither Walsh nor Rodriguez ever said to Ortiz that they said they had copies of Plaintiff's tax returns or planned to destroy Plaintiff's career).) By contrast, Plaintiff testified in a deposition Ortiz told her that Defendant Walsh said he and his partner, Rodriguez, "were not going to endorse [her] if [she] ran for mayor" because they "d[id]n't like her"; that if she ever ran for mayor they would "make [her] life a little bit of a living hell," and that "they had copies of [Plaintiff's] tax returns." (Decl. of Darius Chafizadeh, Esq. in Supp. re: Mot. for Partial Summ. J., Ex. TT, at 93:8–95:10 (Dkt. No. 95-46).) In support of her claim, Plaintiff cites exclusively her own testimony, which is hearsay. She was not there when this alleged conversation occurred, she does not say that she ever saw any of these individuals with a copy of her tax returns, and she does not cite any other admissible evidence to the effect that they had her tax returns or that they made these statements. Accordingly, the Court cannot credit her account. *See Bragg v. Airway Cleaners, LLC*, No. 21-CV-9587, 2024 WL 916040, at *1 n.1 (S.D.N.Y. Mar. 4, 2024) ("Any facts contested or challenged by pointing to admissible evidence in the record are considered to be disputed . . . . However, facts that are not contradicted with admissible evidence are deemed admitted." (citing *Giannullo*, 322 F.3d at 140)).

suffer from the same evidentiary deficiencies, and the Court likewise will not credit them on a Motion for Summary Judgment.[4]

2. The Haverstraw 2020 Election

During the 2020 election cycle—after Plaintiff and her mother opted not to support Defendant Walsh's reelection campaign—Plaintiff was supporting and fundraising for the New York State Senate campaign of now-Senator James Skoufis. (Pl.'s 56.1 ¶ 28.) She herself was also running in an uncontested election to renew her position as a Village Trustee. (*Id.* ¶ 30.) The election was uncontested insofar as there were two candidates running for two open positions. (*See id.* ¶ 183; Decl. of Darius Chafizadeh, Esq. in Supp. of Mot. for Partial Summ. J., Ex. GG ("Ex. GG"), at ROCKLAND_001217 (Dkt. No. 95-33).)[5]

On the day of the 2020 election, it appears that there were issues at the Village's polling site (the "Polling Place"). That morning, Haverstraw's Mayor, Michael Kohut ("Kohut" or "Mayor Kohut"), received complaints about irregularities, some of which had to do with the

---

[4] There is also a fatal hearsay issue with the available "proof" for Plaintiff's position. Plaintiff claimed that the Haverstraw Village Clerk told her that Village Trustee Rafael Bueno, Sr. ("Bueno") told the Clerk about a conversation Bueno had with Walsh in June 2020. (Pl.'s 56.1 ¶ 146.) In that conversation, Walsh purportedly asked Bueno for information, or "dirt," on Plaintiff. (*Id.* ¶¶ 146–48.) Bueno and Walsh executed affidavits stating that this conversation did not occur, that Walsh never made such an ask of Bueno, and repudiating certain other related allegations contained in Plaintiff's pleadings. (*Id.* ¶¶ 147–51; *see generally* Decl. of Darius Chafizadeh, Esq. in Supp. of Mot. for Partial Summ. J., Ex. YY (Dkt. No. 95-51).) In contrast, Plaintiff points to her own testimony as to things "Mayor Kohut . . . told [her]" about a conversation he had with Bueno, as well as her testimony that "Bueno informed . . . [the] clerk" about the earlier conversation with Walsh. (Decl. of Darius Chafizadeh, Esq. in Supp. of Mot. for Partial Summ. J., Ex. TT at 185:10–189:17, 275:24–277:10 (Dkt. No. 95-46).) The former testimony is hearsay, and the latter (that Walsh said something to Bueno who said something to the Clerk who said something to Plaintiff) is hearsay three times over.

[5] In citations to materials filed on the docket, the Court refers to page numbers using the numbers designated on the documents themselves. Where the documents lack page or paragraph numbers, the Court refers to page numbers as generated by the Court's Electronic Case Filing System, which appear at the top-right corner of each page.

types of ballots that had been delivered to the Polling Place (namely, certain district ballots had not been received), from the Commissioner of the County Board of Elections, Kristen Zebrowski-Stavisky ("Zebrowski-Stavisky"), and from one of his relatives. (Pl.'s 56.1 ¶¶ 31, 40; Decl. of Nathaniel B. Smith, Esq. in Opp'n re: Mot. for Partial Summ. J., Ex. 2 ("Ex. 2"), at 19:00–23:23, 26:30–27:03.) Kohut resolved to make his way to the Polling Place to respond. (*See* Pl.'s 56.1 ¶¶ 41–42; *see also* Ex. 2, at 19:00–23:23, 26:30–27:03.) In addition, before leaving his home, Mayor Kohut called Plaintiff; she arrived at the Polling Place by approximately 7:36 AM. (Ex. 2, at 19:00–23:23, 26:30–27:03; Pl.'s 56.1 ¶ 32.)

Around 7:36 AM, Plaintiff walked into the Polling Place; she walked behind tables at the site that had been set up to designate and assign election inspectors; she then spoke with the election site coordinator, Melanie Rivera ("Rivera" or "Election Site Coordinator Rivera"). (Pl.'s 56.1 ¶¶ 33–34.) As reflected on video cameras at the Polling Place, at 7:39 AM, Plaintiff picked up a ballot, walked behind the tables with it in her hand, and continued walking, moving off of the video recording. (Pl.'s 56.1 ¶¶ 35–37; Decl. of Darius Chafizadeh, Esq. in Supp. re: Mot. for Partial Summ. J., Ex. U ("Ex. U"), at ROCKLAND_005490–ROCKLAND_005485 (Dkt. No. 95-12); Decl. of Darius Chafizadeh, Esq. in Supp. of Mot. for Partial Summ. J., Ex. TT, at 294:5–295:4, 297:20–23.) Plaintiff claims that she picked up the ballot to explain to others on-site that each of the ballots were the same, and so the lack of ballots for certain districts was immaterial because voters could use ballots designated for other districts. (Pl.'s Decl. ¶ 14; *see also* Ex. 2 (describing on-site issues).) While holding the ballot, Plaintiff "realized that her name was on the ballot and said to herself, 'I should not be doing this [*i.e.*, carrying a ballot

around that was not hers],' because she did not think it was appropriate." (Pl.'s 56.1 ¶ 35.) Plaintiff said as much to a woman who was standing next to her. (*Id.* ¶ 36.)[6]

At 7:44 AM, Plaintiff again spoke with Election Site Coordinator Rivera. (*Id.* ¶ 39.) By 7:46 AM, Mayor Kohut had arrived at the Polling Place, and Zebrowski-Stavisky arrived shortly thereafter. (*Id.* ¶ 42.) Plaintiff met with Mayor Kohut and Zebrowski-Stavisky for approximately ten minutes. (*Id.* ¶¶ 40, 43.) The Mayor directed Plaintiff to call another Village Trustee, Gilbert Carlevaro, Jr. ("Carlevaro") for additional assistance. (Decl. of Darius Chafizadeh, Esq. in Supp. of Mot. for Partial Summ. J., Ex. TT, at 299:10–18 (Dkt. No. 95-46); Ex. 2, at 19:00–21:00.) By 8:14 AM, Carlevaro arrived at the Polling Place. (Pl.'s 56.1 ¶ 44.)

---

[6] Defendants submit that at 7:41 AM on Election Day, Plaintiff texted another Trustee of the Village of West Haverstraw, "Btw we are trying to see if we can find a way to see if we can [get] a list of who voted in the villages so far." (Defs.' 56.1 ¶ 38.) In support, they cite a [redacted] submitted as part of subsequent grand jury exhibits. (*Id.*) Plaintiff, citing the same [redacted], claims that this text message "is recorded to have been made at 1:41 [PM], not 7:41 [AM]." (Pl.'s 56.1 ¶ 38.) However, the [redacted] data indicates that the timestamps are recorded in so-called "UTC," or "Coordinated Universal Time." (*See* Ex. GG, at Rockland_001440 (Dkt. No. 95-33).) Coordinated Universal Time (effectively identical to Greenwich Mean Time) is a standardized time around which all time zones are based. *See Coordinated Universal Time*, Wikipedia (last visited June 5, 2026), https://en.wikipedia.org/wiki/Coordinated_Universal_Time [https://perma.cc/X38L-3MNZ]. Depending on the time of year, New York (and the Village of Haverstraw) are either five hours behind UTC (UTC-5) during standard time, or four hours behind UTC (UTC-4) during daylight savings time. *See UTC-5:00*, Wikipedia (last visited June 5, 2026), https://en.wikipedia.org/wiki/UTC%E2%88%9205:00 [https://perma.cc/HLQ2-764C]; *UTC-4:00*, Wikipedia (last visited June 5, 2026), https://en.wikipedia.org/wiki/UTC%E2%88%9204:00 [https://perma.cc/N9MA-PEWV]. As of November 1, 2020 (the first Sunday in the month of November, which marks the beginning of standard time in the United States), Haverstraw was in UTC-5. The time stamp on this text is 11/3/2020 at 1:41:24 AM UTC+0. (*See* Ex. GG at Rockland_001440.) Accordingly, the only materials cited by either party suggest that this text was sent five hours before that time, *i.e.*, 8:41:24 PM on 11/2/2020, the night *before* the election. In the absence of record evidence supporting any Party's conclusion, the Court cannot credit either position on a motion for summary judgment. *See Lee v. Glessing*, 140 F. Supp. 2d 215, 224 (N.D.N.Y. 2001) ("As neither party offers any evidence to conclusively support their respective positions, a question of fact exists that precludes summary judgment in defendants favor.").

By about 8:16 AM, the Mayor and Carlevaro met with Rivera, who swore Carlevaro in as an election inspector. (*Id.* ¶ 45.)

By 8:22 AM, Plaintiff left the Polling Place. (*Id.* ¶ 46.) She claims that Carlevaro "asked [her] to go and get him some food and coffee because he . . . c[a]me immediately to the site from his home that morning when [she called] and [he] had not yet eaten that day." (Pl.'s Decl. ¶ 15.) At 8:38 AM, Plaintiff re-entered the Polling Place carrying a brown paper bag. (Pl.'s 56.1 ¶ 48; *see also* Ex. U, at ROCKLAND_005524.)[7] This, Plaintiff says, was Carlevaro's food. (Pl.'s Decl. ¶ 15.) She met with Carlevaro and spoke with him briefly. (Pl.'s 56.1 ¶ 49.) She then talked to Rivera and left the Polling Place. (*Id.* ¶ 50.)

At 10:48 AM, Plaintiff, apparently still outside the Polling Place, texted Carlevaro, "How['s] it going[?]" (*Id.* ¶ 51.) Carlevaro called Plaintiff around 11:03 AM. (*Id.* ¶ 52.) Around 12:10, Plaintiff returned to the Polling Place to vote; Carlevaro took a photograph of her and her family members there. (*Id.* ¶ 53.) For the remainder of the afternoon, Plaintiff exchanged texts with a contact in her phone labeled "Carlos (Skoufis Chief of Staff)," as well as Carlevaro. (*Id.* ¶¶ 54–59.)

By the end of the day, Mayor Kohut received a poll-watcher certificate. (*See* Pl.'s 56.1 ¶ 41.) However, in a later interview Kohut explained that the regular practice in past elections,

---

[7] Defendants submit that at 8:36 AM, Plaintiff sent a text to five recipients reading: "If you haven't voted don't forget to please vote and VOTE for just ME. Lol. It's all about ME ME ME ME." (Defs.' 56.1 ¶ 47.) Again, they cite exclusively the Cellebrite Extraction Report. (*See id.*) In response, Plaintiff contends that "the timestamp is for 1:36 [PM.]" (Pl.'s 56.1 ¶ 47.) But the Cellebrite Report indicates that this text was sent at 1:36:22 AM on 11/3/2020 in the UTC+0 time zone. (*See* Ex. GG at Rockland_001442.) That means that the only evidence cited supports the conclusion that this message was sent at 8:36:22 PM the night *before* the election so, once again, the Court cannot rely on any Party's position in evaluating this Motion for Partial Summary Judgment.

as well as the 2020 election, was that he would receive a poll-watcher certificate—despite not serving as a poll-watcher—so that he could obtain a tally of the number of voters who participated in that day's election. (Ex. 2, at 19:00–23:23, 33:30–34:26.)[8]

3. The Investigation

Shortly after Election Day in 2020, a confidential informant (the "Informant"), who was also acquainted with Defendant Walsh, informed Defendant Walsh, Chief Assistant District Attorney Patrick Frawley and then-Chief of Detectives Peter Walker with information that the informant had seen Carlevaro "working as an election inspector at the Polling Place in alleged violation of the Election Law." (Pl.'s 56.1 ¶ 60.) This conversation took place at Walsh's house, assertedly due to the COVID pandemic and Walsh's recovering from a medical procedure. (Decl. of Darius Chafizadeh, Esq. in Supp. of Mot. for Partial Summ. J., Ex. WW ("Ex. WW"), at 44:7–44:15 (Dkt. No. 95-49).) Defendant Walsh attested that he understood the informant to be concerned about Carlevaro's serving as a polling inspector.[9] (Pl.'s 56.1 ¶ 61; *see also* Ex. WW, at 46:7–46:19.)

After receiving the information, on or around November 9, 2020, the Rockland County District Attorney's Office ("RCDAO") issued the first of several subpoenas; this subpoena was targeted to the Village of Haverstraw and sought footage of the Polling Place on Election Day.

---

[8] Defendants repeatedly assert that Kohut in fact served as a poll watcher, but cite no evidence other than the certificate and an attorney's characterization of the certificate. (Pl.'s 56.1 ¶ 41; *see* Decl. of Darius Chafizadeh, Esq. in Supp. of Mot. for Partial Summ. J., Ex. XX at 85:8–19; Ex. GG, at ROCKLAND_001362.) Kohut's own testimony is inconsistent with this account. (*See* Ex. 2, at 19:00–23:23, 33:30–34:26.)

[9] Plaintiff objects to the cited materials and conclusion on hearsay grounds. (Pl.'s 56.1 ¶ 61.) But this statement is not necessarily hearsay. *See United States v. Alston*, No. 15-CR-435, 2016 WL 5806790, at *4 (S.D.N.Y. Sept. 27, 2016) ("[T]he Second Circuit has held that a first-hand participant in a conversation has an adequate basis of personal knowledge to testify about his understanding of statements made during the conversation.").

(Pl.'s 56.1 ¶ 62.) The Parties, in essence, dispute whether Defendant Walsh had to go before a grand jury to obtain this subpoena or whether he unilaterally issued it without any grand jury's involvement. (*See, e.g.*, Pl.'s 56.1 ¶¶ 62–63, 103, 109.) The Office received surveillance video that was consistent with the above-described series of election day events. (Pl.'s 56.1 ¶ 64.)

Based on the complaint about Carlevaro and the video of the polling place, Defendant Walsh has stated that he believed that Plaintiff's presence could have a chilling effect on the voters who saw Plaintiff at the Polling Place. (*Id.* ¶ 67.) The RCDAO reports that it had an "operational theory" that Plaintiff went to the Polling Place "to gauge election results on behalf of James Skoufis, another candidate who was running in a contested race for New York State senator" and on whose behalf, as mentioned above, Plaintiff had fundraised. (*Id.* ¶ 69.)

In the subsequent days, additional subpoenas were issued to Plaintiff's cell phone carrier for subscriber information regarding her phone. (Decl. of Darius Chafizadeh, Esq. in Supp. of Mot. for Partial Summ. J., Ex. K ("Ex. K."), at ROCKLAND_005168 (Dkt. No. 95-11).) The RCDAO obtained and executed warrants for Plaintiff's cell phone and review of information therefrom. (Pl.'s 56.1 ¶ 74 (not contesting that such warrants were obtained).) Subpoenas were also issued to cellular providers seeking records of other individuals who had been at the Polling Place on Election Day. (*Id.* ¶ 75.)

a. Search and Seizure of Plaintiff's Phone

Specifically, during the investigation, Defendant Walsh directed Defendant Sher, an Assistant District Attorney, to prepare an application for a warrant to seize and search Plaintiff's cell phone. (*Id.* ¶ 84.) Defendant Guccione, also an Assistant District Attorney, reviewed and commented on a draft of the application for a warrant to seize and search Plaintiff's phone. (*Id.* ¶ 85.) Among other comments, Defendant Guccione wrote, "No P.C. for electioneering, ballot

or behind tables so all data/phone calls/video references to same are irrelevant" and "no evidence of electioneering." (Decl. of Nathaniel B. Smith in Opp'n re: Mot. for Partial Summ. J., Ex. 9 at 1 (Dkt. No. 103-9).) Plaintiff claims that this comment, along with Guccione's later testimony, establishes that there was no probable cause to search her phone for evidence of electioneering. (Pl.'s 56.1 ¶ 87.) Defendants, on the other hand, point to Defendant Sher's deposition testimony that, based on Defendant Guccione's feedback, the two "compiled and revised several drafts to ensure that there was [probable cause] when [they] applied for [the warrant.]" (Decl. of Darius Chafizadeh, Esq. in Supp. of Mot. for Partial Summ. J., Ex. VV ("Ex. VV"), at 273:17–273:19 (Dkt. No. 95-48).)

A revised version of the warrant application was submitted to a neutral magistrate, Justice Zuckerman, who signed and issued it. (Pl.'s 56.1 ¶¶ 88–89.) The only "false" evidence Plaintiff suggests was in this report is the following statement: "CI #1 believed that Trustee Carlevaro was consistently pointing at the ballot in an effort to persuade people who to vote." (Decl. of Darius Chafizadeh, Esq. in Supp. of Mot. for Partial Summ. J., Ex. T ¶ 7(d) (Dkt. No. 95-20).) In response, Plaintiff says that the absence of this information in the investigator's narrative report suggests that it is untrue, and claims that "if RCDAO genuinely believed that Carlevaro was steering voters, then those facts completely undercut" their decision not to charge Carlevaro. (Pl.'s 56.1 ¶ 90.) The search warrant application noted that Plaintiff was running unopposed. (*Id.* ¶ 91 (not contesting this allegation).)

On, around, or between September 7 to September 9, 2021, Defendant Smith and four other investigators took shifts covering Plaintiff's residence in an attempt to execute the search warrant. (*Id.* ¶ 93.) The warrant expired on September 10, 2021, without its having been executed. (*Id.* ¶¶ 94–95.)

On September 13, 2021, Defendant Smith submitted another search warrant application to Justice Zuckerman. (*Id.* ¶ 95.) Plaintiff identifies no additional "falsities" in this warrant besides the above-mentioned point about Carlevaro. (*Id.* ¶ 96.) The warrant again noted that Plaintiff was running unopposed. (*Id.* ¶ 97.) Justice Zuckerman again issued the requested warrant. (*Id.* ¶ 98.) Later that day, the RCDAO executed the warrant on Plaintiff and seized her cell phone. (*Id.* ¶ 99.)

b. Allegations of Surveillance and the Screw in Plaintiff's Tire

Plaintiff believes that she was surveilled by the RCDAO. She says that in 2021, on one occasion, "someone who looked like a police officer sat in a vehicle watching her and a friend have coffee at a park," though neither she nor her friend approached the person to determine who he was. (*Id.* ¶¶ 155–56.) Plaintiff also claims that, on another occasion in late summer or early fall of 2021, she was having coffee with Carlevaro and his wife at Starbucks and Trustee Carlevaro pointed out someone he knew to be a police officer who was allegedly watching them. (*Id.* ¶ 157.) Further, she claims that, in the summer of 2021, she woke up early in the morning to see a vehicle parked on the street outside of her home. (*Id.* ¶ 158.) She went to take a picture, but by the time she exited her home the vehicle had left. (*Id.*) Someone at a neighboring barbershop "said that the vehicle was parked in that location all night." (*Id.* ¶ 158.)

Around September 20, 2021, Plaintiff drove to Suffern, NY to visit her sister and niece at their shop. (*Id.* ¶ 167.) She worked from their shop that day, and parked her vehicle in a nearby lot. (*Id.*) At 6:00 PM, Plaintiff returned to her vehicle. (*Id.* ¶ 168.) She drove for about 200 feet, but discovered that her rear driver-side tire was flat, and a screw was embedded in it. (*Id.*) Plaintiff obtained surveillance footage, which shows three men—whom she believed to be police officers—walking around the parking lot. (*Id.* ¶ 170.) These men were, in fact, police officers:

two Detective Sergeants and one Detective from the Village of Suffern Police Department. (*Id.* ¶ 173.) The video shows one of the officers approaching Plaintiff's vehicle, squatting, and getting back up. (*Id.*; *see also* Decl. of Darius Chafizadeh, Esq. in Supp. re: Mot. for Partial Summ. J., Ex. Z (Dkt. No. 95-26).) Admittedly, none of these Detectives was involved in the investigations of Plaintiff. (Pl.'s 56.1 ¶ 174.) Investigator Smith, a former sergeant for the Suffern Police Department, understood that these individuals were "present in the subject parking lot on September 20, 2021 investigating a separate investigation that had no relation to the grand jury investigation of Plaintiff." (*Id.* ¶ 175.) Walsh testified that he did not know what these individuals were doing in the lot. (*Id.* ¶ 176.)[10]

Around this same time, Plaintiff resigned from her position in local government. (Pl.'s Decl. ¶ 18.)

Plaintiff claims that around January 16, 2022, RCDAO investigators surveilled her home; however, Plaintiff does not know the names of the purported investigators, and merely assumed they were affiliated with the RCDAO because of the "way they were behaving and acting." (Pl.'s 56.1 ¶¶ 159–60.) A similar event occurred on or around February 11, 2022: a woman took photos of Plaintiff's niece's shop and its security cameras, and Plaintiff assumed that this person was associated with the RCDAO based on how the woman and another man who was with her were behaving, though she did not specify further the behavior that imparted this impression. (*Id.* ¶¶ 161–62; *see also* Decl. of Darius Chafizadeh, Esq. in Supp. of Mot. for Partial Summ. J.,

[10] Plaintiff objects to Smith's testimony of his "understanding" on hearsay grounds but, as described above, an individual's testimony as to their own understanding of a conversation is not necessarily hearsay. And Plaintiff objects to Walsh's testimony as to his lack of knowledge, but provides no alternative basis or evidence to support that objection, except her characterization of the testimony as self-serving.

Case 7:22-cv-06443-KMK-VR Document 108 *SEALED* Filed 10/30/25 Page 14 of 70

Ex. QQ at 64:11–65:13.) She says that her family members told her "there were people sitting in front of their homes which . . . didn't look right" and they "felt they were being followed." (Pl.'s 56.1 ¶¶ 153–54 (alteration in original).) She also says that multiple vehicles sat outside her residence and her sister's place of employment throughout 2022. (*Id.* ¶ 163.)

c. The Farmers Market & Grand Larceny Investigations

The Confidential Informant also informed the RCDAO that Plaintiff was working at a Farmers Market run by the Village of Haverstraw "to 'pad' her government pension." (*Id.* ¶ 105.) The RCDAO investigated this claim, along with the Department of Audit Control at the New York State Comptroller's Office, but the two entities decided not to pursue any charges against Plaintiff related to her Farmers Market compensation. (*Id.* ¶¶ 106–07.)

As part of the Farmers Market investigation, the RCDAO issued a subpoena for Plaintiff's bank records to confirm payments made by the Village of Haverstraw to Plaintiff related to the Farmers' Market. (*Id.* ¶ 109.) When reviewing those bank records, the Office noted "substantial sums of money being deposited from a charity, the Rockland Community Foundation, to Plaintiff's personal bank account." (*Id.* ¶ 110.) Purportedly, Plaintiff worked with her sister, who falsified receipts from a catering company for food that would be distributed to families in need, but the food was never actually prepared or given to those families. (*Id.* ¶ 112.) The receipts were submitted to the Rockland Community Foundation for reimbursement. (*Id.*) Plaintiff's sister then took the funds. (*Id.*) The two carried out a similar scheme based on falsified purchases for backpacks for children in need, and a backpack bingo fundraiser (which appears to have actually occurred) where some of the funds were misappropriated. (*Id.*) The Office identified the scheme by interviewing a restaurant owner. (*Id.* ¶ 113.) After further investigation, the Office presented grand larceny charges to a grand jury; those charges were

prosecuted against Plaintiff, who ultimately pleaded guilty. (*Id.* ¶ 111.) Plaintiff's sister likewise pleaded guilty to grand larceny. (*Id.* ¶ 115.)

d. Investigation of General Municipal Law § 801 Violations

The Office also investigated whether Plaintiff, an elected official, received renumeration in an amount that exceeds $750 per year in violation of General Municipal Law § 801 through businesses that she owned titled "Blu River Media Group, Inc. and EMSolutions, Inc." (*Id.* ¶ 116.) The Office had information that "BLU RIVER Marketing, Inc." appeared to have received $1,000 from the North Rockland Chamber of Commerce, General Fund Account, on or about October 17, 2019, related to a "Harvest Dinner – Event Date October 17, 19." (*Id.* ¶ 117.) However, the Office chose not to present any charges against Plaintiff related to these issues. (*Id.* ¶ 118.)

e. Mortgage Fraud Investigation

The Office further determined that Plaintiff's company, Blu River Media Group, Inc., obtained a Department of Housing and Urban Development ("HUD") mortgage (through the County of Rockland) on property to which Plaintiff's mother was the record title holder. (*Id.* ¶ 119.) Around October 2016, Plaintiff, on behalf of the company, took out a $50,000 mortgage for the property located at 6-8 Broadway in the Village of Haverstraw although the company had no ownership interest in that property. (*Id.* ¶ 120.) The mortgage note, however, had already been repaid by the time this fact was determined. (*Id.* ¶ 121.) The Office did not pursue any further investigation. (*Id.*)

f. The Article 78 Proceeding

Plaintiff felt that the subpoenas issued in the course of the investigation were overbroad. (*Id.* ¶¶ 123–24, 129–30.) In particular, she objected to the fact that one of the subpoenas to the

Village requested copies of communications between Plaintiff's mother and representatives of the Village. (*Id.* ¶ 125.)

On January 8, 2021, the Village filed a petition in Supreme Court, Rockland County, pursuant to Article 78 of the N.Y. Civil Practice Law and Rules (commenced by order to show cause), seeking to quash, vacate and or modify certain of the grand jury subpoenas duces tecum issued by the RCDAO. (*Id.* ¶ 126.) The RCDAO opposed the Village's Article 78 Petition, first by the filing of a letter in opposition (together with enclosures), and second, by the filing of an affirmation of ADA Sher in opposition to the petition. (*Id.* ¶ 127.) On January 28, 2021, the Supreme Court denied the Village's Petition to quash. (*Id.* ¶ 128.)

It is undisputed that a grand jury was impaneled throughout the duration of these events, though Plaintiff claims that no grand jury was impaneled to hear any evidence for charges against her until October 2021. (*Id.* ¶¶ 133–36.)

4. <u>Sexual Misconduct Allegations against DA Walsh</u>

Plaintiff "spoke to a retired FBI agent and," in the summer of 2021, "with an active member of the FBI" about the alleged sexual misconduct of Defendant Walsh. (Pl.'s 56.1 ¶¶ 20, 114.) Plaintiff also told her sister and, she says, Mayor Kohut and Town Attorney Jay Hood about the allegations. (*Id.* ¶ 21.) During her conversation with the FBI Agent, Plaintiff communicated that she had heard allegations that Walsh "had allegedly 'spiked' a woman's drink together with a man named 'Bob.'" (*Id.* ¶ 22.) Plaintiff also said that the woman attempted to file a complaint against Walsh, but "dropped the complaint after DA Walsh allegedly harassed her." (*Id.* ¶ 23.) It is contested at what point Walsh became aware that Plaintiff believed he had engaged in sexual misconduct. (*See* Pl.'s 56.1 ¶ 114 (Defendants

contending that Walsh was unaware of the allegations until after the grand jury returned a true bill, and Plaintiff reasserting that she reported the misconduct in 2021).)

5. Presentment of Election Law Charges to Grand Jury

Although they were misdemeanors rather than felonies, the RCDAO presented the Election Law Charges against Plaintiff to a grand jury. (Pl.'s 56.1 ¶ 180.) Defendant Walsh testified that he chose to bring these charges against Plaintiff before a grand jury due to the "general atmosphere" of the environment in Haverstraw and because "in the Facebook world" "a lot of bad things were being said about people that they didn't deserve." (Ex. WW, at 138:10–24.) He also stated that he hoped to "ensure the integrity of the judicial process" in Rockland County. (*Id.* at 139:2–139:5.) The RCDAO did not pursue charges against Mayor Kohut or Carlevaro. (Pl.'s 56.1 ¶¶ 70, 72 (not contesting that charges were not pursued against Kohut or Carlevaro).)[11]

The grand jury proceedings began on November 15, 2021. (*See* Decl. of Darius Chafizadeh, Esq. in Supp. of Mot. for Partial Summ. J., Ex. DD (Dkt. No. 95-30).) During the proceedings, [redacted]. (Pl.'s 56.1 ¶ 181.) [redacted] (*Id.* ¶ 182.) The Parties have produced a copy of the ballot: while it does not expressly state that the election for Village Trustee was uncontested, it lists only two candidates, and provides "Vote for up to two" in the instructions section. (Ex. GG, at

[11] Defendants claim that Carlevaro was given immunity in exchange for his testimony, but they do not point to any evidence supporting this conclusion. (*See* Defs.' 56.1 ¶ 73.) Plaintiff, however, appears not to contest this fact but simply contests that Carlevaro "provided any testimony to implicate Dominguez in any criminal conduct," although he did testify before the grand jury. (Pl.'s 56.1 ¶ 73.)

Case 7:22-cv-06443-KMK-VR Document 108 *SEALED* Filed 10/30/26 Page 18 of 70

ROCKLAND_001217 (Ballot Sheet).) [redacted] (*Id.*, Ex. DD at 27:15–27:17.) [redacted] (Pl.'s 56.1 ¶¶ 188–89.) The grand jury proceedings appear to have concluded on November 22, 2021. (*See* Decl. of Darius Chafizadeh, Esq. in Supp. of Mot. for Partial Summ. J., Ex. FF ("Ex. FF") (Dkt. No. 95-32); *see also id.*, Ex. HH (Dkt. No. 95-34).)

6. Plaintiff's Arrest

On or near November 22, 2021, an arrest warrant issued for Plaintiff based on the Election Law charges in the Grand Jury indictment. (Pl.'s 56.1 ¶ 192.) The charges were two counts of unlawfully entering within the guardrail of a polling place in violation of Election Law § 17-130(6), as well as one count of electioneering, in violation of Election Law § 17-130(4). (Pl.'s 56.1 ¶ 192.) Arrest is not necessarily required for low level offenses like those Plaintiff faced; rather, she could have been sent a summons or desk appearance ticket. (*See, e.g.*, Ex. VV, at 67:9–20 (ADA Sher explaining, in a deposition, that it would "certainly [be] permissible" to proceed by a desk appearance ticket rather than arrest); Decl. of Darius Chafizadeh, Esq. in Supp. of Mot. for Partial Summ. J., Ex. RR, at 67:13–15 (Dkt. No. 44) (Defendant Fitzgerald describing that, at some agencies, "sometimes you . . . have an option between processing and having an appearance ticket").) *See also* N.Y. CPL § 210.10(3) (describing availability of summons in lieu of issuance of a warrant). It is also undisputed, however, that police officers have the discretion to arrest someone on allegations that they committed an unclassified misdemeanor. (Pl.'s 56.1 ¶ 209.)

On or around November 30, 2021, Defendant Fitzgerald arrested Plaintiff on electioneering charges. (*Id.* ¶¶ 102, 201, 203–04.) Defendants Fitzgerald and Smith met Plaintiff in the public vestibule before the courtroom, where they informed her that she had a warrant for her arrest for violations of the Election Law. (*Id.* ¶ 206.) Fitzgerald handcuffed Plaintiff. (*Id.* ¶ 210.) He and Defendant Smith guided her out of the Courthouse and transported her to the Clarkstown Police Department, a drive that would take fewer than five minutes. (*Id.* ¶ 211.) Defendant Fitzgerald issued Plaintiff an appearance ticket and she was released from custody. (*Id.* ¶ 212.) Defendant Fitzgerald could not recall which supervisor directed him to execute the arrest warrant. (*Id.* ¶ 201.) After the arrest, Defendant Fitzgerald had no further involvement with regard to the Election Law prosecution. (*Id.* ¶ 216.) This arrest occurred after Plaintiff had already voluntarily turned herself in once voluntarily on the Grand Larceny charges and appeared before Judge Zuckerman. (Decl. of Darius Chafizadeh, Esq. in Supp. of Mot. for Partial Summ. J., Ex. SS, at 44:14–49:23.) Indeed, Plaintiff had gone to the courthouse that day for a conference related to the Grand Larceny charges. (Pl.'s 56.1 ¶ 205.)

Plaintiff submits that Defendant Walsh was undoubtedly aware that a warrant had been issued for her arrest. (Pl.'s 56.1 ¶ 194.) As the District Attorney, he was also involved in her investigation; knew that she would be arrested in the Courthouse where he also worked; and the individuals involved in arresting Plaintiff worked for Walsh or his Office. (*Id.* ¶ 195 and materials cited therein.) Plaintiff points to no other evidence of his involvement in Plaintiff's prosecution. (*Id.*)

7. Subsequent Developments

By October 12, 2023, the election law charges were adjourned in contemplation of dismissal. (*Id.* ¶ 219.) This adjournment was issued at the same time that Plaintiff pleaded guilty to the grand larceny charges. (*Id.* ¶ 220.)

B. Procedural Background

On July 29, 2022, Plaintiff commenced this Action *pro se*. (Compl. (Dkt. No. 1).) On November 4, 2022, Defendants, along with other individuals then named as defendants in the operative complaint, moved to dismiss. (*See* Mot. to Dismiss the Am. Compl. (Dkt. No. 15).) Amidst briefing, (*see* Pl.'s Opp'n (Dkt. No. 22); Reply Mem. of L. in Supp. re: Mot. to Dismiss (Dkt. No. 25)), Plaintiff requested leave to amend the complaint, (*see* Letter from Emily Dominguez to Court (Dec. 16, 2022) (Dkt. No. 20)). The Court denied the Motion to Dismiss as moot due to the request to amend, which the Court granted. *See Dominguez v. Walsh*, No. 22-CV-6443, 2023 WL 6199861, at *5 (S.D.N.Y. Sept. 22, 2023).

Shortly thereafter, Plaintiff obtained counsel. (*See* Not. of Appearance (Dkt. No. 28); Not. of Appearance (Dkt. No. 32).) She then filed two amended complaints in quick succession. (*See* Second Am. Compl. (Dkt. No. 31); Third Am. Compl. (Dkt. No. 36).) Defendants thereafter sought leave to file a Motion to Dismiss portions of the Third Amended Complaint. (Letter from Darius P. Chafizadeh, Esq. to Court (Jan. 10, 2024) (Dkt. No. 37).) The Court set a briefing schedule, (*see* Dkt. (minute entry for proceedings held on February 21, 2024)), and briefing proceeded on the Motion to Dismiss, (*see* Mot. to Dismiss (Dkt. No. 46); Defs.' Mem. of Law in Supp. of Mot. to Dismiss (Dkt. No. 48); Mem. of L. in Opp'n re: Mot. to Dismiss (Dkt. No. 51); Reply (Dkt. No. 57).) The Court granted in part and denied in part Defendants' Motion to Dismiss. *See Dominguez v. Walsh*, No. 22-CV-6443, 2025 WL 618868 (S.D.N.Y.

Case 7:22-cv-06443-KMK-VR Document 108 *SEALED* Filed 01/30/26 Page 21 of 70

Feb. 26, 2025). In its Motion to Dismiss Opinion, the Court explained that, "Walsh is entitled to absolute immunity on all claims against him—with the exception of Count One, to the extent it asserts an excessive force claim, and Count Seven—insofar as such claims are based on allegations related to his decision to initiate and conduct the Election Law prosecution against Plaintiff." *Id.* at *11. Simultaneously, "[t]he Court decline[d] to find Walsh absolutely immune for all other claims insofar as they are based on Walsh's allegedly investigatory actions prior to the initiation of said prosecution." *Id.* The Court afforded Plaintiff the opportunity to file a Fourth Amended Complaint, as the Opinion was the first adjudication of Plaintiff's claims. *Id.*

On March 28, 2025, Plaintiff filed the operative FAC. (*See* FAC.) On April 22, 2025, Defendants sought leave to file a motion for summary judgment. (*See* Letter from Darius P. Chafizadeh, Esq. to Court (Apr. 22, 2025) (Dkt. No. 87).) After the Court adopted a briefing schedule, (*see* Mem. Endorsement dated Sept. 26, 2025 (Dkt. No. 91)), Defendants filed the Motion currently before the Court. (*See* Mot.) Defendants filed their Memorandum of Law in support of the Motion on November 14, 2025. (*See* Defs.' Mem. in Supp. re: Mot. for Partial Summ. J. ("Defs.' Mem.") (Dkt. No. 97).) On January 9, 2026, Plaintiff filed her Memorandum of Law in opposition. (Pl.'s Mem. of L. in Opp'n re: Mot. for Partial Summ. J. ("Pl.'s Opp'n") (Dkt. No. 100).) On January 30, 2026, Defendants filed their Reply. (Reply Mem. of Law in Supp. re: Mot. for Partial Summ. J. ("Defs.' Reply") (Dkt. No. 105).)

## II. Discussion

### A. Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (same); *Psihoyos v.*

*John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same). "In deciding whether to award summary judgment, the court must construe the record evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Torcivia v. Suffolk Cnty.*, 17 F.4th 342, 354 (2d Cir. 2021); *see also Horror Inc. v. Miller*, 15 F.4th 232, 240 (2d Cir. 2021) (same). "It is the movant's burden to show that no genuine factual dispute exists." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Red Pocket, Inc. v. Interactive Commc'ns Int'l, Inc.*, No. 17-CV-5670, 2020 WL 838279, at *4 (S.D.N.Y. Feb. 20, 2020) (same).

"However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the non[-]movant's claim," in which case "the non[-]moving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. PricewaterhouseCoopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration adopted, citation and quotation marks omitted). Further, "[t]o survive a [summary judgment] motion . . ., [a non-movant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. Cnty. of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other

evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . .”).

“On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law.” *Royal Crown Day Care LLC v. Dep’t of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quotation marks omitted). At this stage, “[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried.” *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (citation omitted). Thus, a court’s goal should be “to isolate and dispose of factually unsupported claims.” *Geneva Pharms. Tech. Corp. v. Barr Laby’s. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quoting *Celotex*, 477 U.S. at 323–24).

When ruling on a motion for summary judgment, a district court should consider only evidence that would be admissible at trial. *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998). “[W]here a party relies on affidavits or deposition testimony to establish facts, the statements ‘must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.’” *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)); *see also Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir. 1988) (“Rule 56 requires a motion for summary judgment to be supported with affidavits based on personal knowledge . . . .”); *Baity v. Kralik*, 51 F. Supp. 3d 414, 419–21 (S.D.N.Y. 2014) (disregarding “statements not based on [the] [p]laintiff’s personal knowledge”); *Flaherty v. Filardi*, No. 03-CV-2167, 2007 WL 163112, at *5 (S.D.N.Y. Jan. 24, 2007) (“The test for admissibility is whether a reasonable trier of fact could believe the witness had personal knowledge.” (citation omitted)).

B. Analysis

The Parties appear to agree that certain of the claims asserted in the FAC are properly dismissed at the summary judgment stage, and that certain others should proceed to trial. Namely, Defendants have not sought summary judgment on Plaintiff's "§ 1983 claim for excessive force against . . . [Defendants] Smith and Fitzgerald," nor her alleged "state common law claim for assault and battery against . . . [Defendants] Smith and Fitzgerald." (Defs.' Mem. 1 n.1.) It also appears that Plaintiff does not contest that Fitzgerald is entitled to summary judgment on Plaintiff's claims for malicious prosecution and abuse of process under New York state law, as she has not pointed to any evidence (or ever claimed) that he was involved in her prosecution. (*See generally* Pl.'s 56.1; Pl.'s Opp'n 6 (agreeing that "several of the claims asserted in the Fourth Amended Complaint . . . do not apply to Fitzgerald because of his lack of involvement in pre-indictment conduct by other members of the RCDAO, but [maintaining] that Fitzgerald is a proper defendant on Dominguez's claim for false arrest under federal and state law").) Accordingly, the Court determines at the outset it is appropriate to grant summary judgment to Defendant Fitzgerald on Counts 2, 3, 8, and 9.

For the reasons that follow, the Court also determines that Defendants' Motion for Partial Summary Judgment should be granted as to the remainder of the claims on which Defendants have moved for such judgment, except insofar as it requested that the Court grant summary judgment as to any state law claims against the County corresponding to the remaining live claims brought under federal law on a theory of respondeat superior.

1. Grand Jury Subpoenas under New York law

Before delving into the merits of Plaintiff's claim, a brief note on New York state law governing the issuance of grand jury subpoenas is useful. Repeatedly in her papers, Plaintiff

dwells on the subpoenas that were issued seeking her information. (*See, e.g.*, Pl.'s Opp'n 13 (attempting to distinguish other cases based on, among other things, the "issu[ance of] 87 subpoenas directed at [Plaintiff's] personal, family, and financial affairs"), 23–24 (emphasizing the issuance of subpoenas seeking Plaintiff's information).) She emphasizes her view that there is something nefarious about the fact that, "[a]lthough Walsh's subpoenas were labeled 'Grand Jury' subpoenas or 'subpoenas duces tecum' for a 'pending criminal action,' the RCDAO did not convene and present to a grand jury evidence about Dominguez until October 2021, for the larceny charges, and November 2021, for the election law charges," after the subpoenas had been issued, and that the subpoenas were "returnable to Walsh's office," presumably taking the view that the subpoenas should have been made returnable to the grand jury. (*Id.* at 16.) Plaintiff claims that this fact, along with ambiguity surrounding the time at which information on the election law charges was presented to the grand jury, supports the conclusion that the RCDAO was issuing the subpoenas abusively. (*See id.* at 17.) This theory undergirds a number of Plaintiff's claims, particularly her abuse of process claim, discussed in Section II.B.5, *infra*.

Under New York law, "there is no requirement that the government open a Grand Jury proceeding prior to the return date of a Grand Jury Subpoena." *Palmer v. Monroe Cnty. Deputy Sheriff*, No. 00-CV-6370, 2004 WL 941784, at *6 (W.D.N.Y. Apr. 29, 2004) (citing *Hirschfeld v. City of New York*, 686 N.Y.S.2d 367 (N.Y. App. Div. 1999)); *see also Williams v. Shanley*, No. 20-CV-688, 2023 WL 7168871, at *13 (W.D.N.Y. Oct. 31, 2023) ("Courts in New York State have rejected claims that empanelment of the grand jury is a prerequisite for the issuance of a subpoena."); *M.B. v. F.T.*, 971 N.Y.S.2d 72, 72 (Sup. Ct. 2013) (describing that the "underlying proceeding [was] pre-indictment," and nevertheless concluding that a grand jury subpoena "issued by the District Attorney . . . [was] within the District Attorney's authority to issue" and

noting that the District Attorney had "broad investigatory powers" during this stage). As one commentator and New York law practitioner explained:

> No prosecutor, unto himself or herself, has th[e] power [to exercise inquisitorial authority]. [Rather a] prosecutor may subpoena witnesses to the grand jury, on its behalf, or, to the court on behalf of the court in a designated criminal action against a named defendant. In neither event may he transform either process into a function of his office. It is documentarily obvious when a designated criminal action is pending against a named defendant. But when does a grand jury proceeding commence? Answer: "When the prosecutor on his own initiative, issues and serves a subpoena in good faith, a proceeding is instituted in the grand jury just as a civil action is commenced by the service of a summons. At the very instant there is a bonafide issuance and service of a subpoena. . . for the appearance of a person before the grand jury in a John Doe investigation, there originates a pending proceeding before the grand jury. . . ." Is there some sort of a magic formula which must be followed in order for a "case" to be "opened" before a grand jury? The answer is no. "Unless mandated by provision of statute, there is no general principle of law which would require identification of subject matter as prerequisite to grand jury appearance."
>
> . . .
>
> It is the grand jury's constitutionally-enshrined common law investigative authority as an institution, encompassing, as it does, its right to everyman's evidence when its process is directed to an individual, which probably accounts for the proposition that a grand jury proceeding is commenced when a prosecutor issues its subpoena in good faith. And it is good faith commanded by an oath of office which largely justifies the flexibility which prosecutors enjoy in harmonizing the jurisprudential theory of the grand jury as an institution with the realities of a world where one must be practical. One illustration is the prosecutor's good faith right to issue subpoenas duces tecum and ad testificandum for the production of documents or testimony before grand jury panel "A" on a given date, notwithstanding that the documents or testimony may actually be presented to panel "Z" months or even years later. Documents may need to be analyzed or processed through human recollection. Or, subpoena litigation into the Court of Appeals may render panel "A" long courthouse history by the time documents are produced or testimony given. Valid issuance of a grand jury subpoena no more depends on a specific grand jury panel's contemporaneous existence than does a summons and complaint commencing a lawsuit depend on the contemporaneous existence of a specific term and part of the Supreme Court.

Lawrence N. Gray, *The Grand Jury as an Institution: Its Essential Character and Miscellaneous Supervision*, 65 N.Y. St. B.J. 38, 38–39 (1993) (footnotes omitted, alterations adopted, emphasis added). To sum it all up: "When the district attorney, on his own initiative, issues and serves

such a subpoena in good faith, a proceeding is instituted in the Grand Jury just as, in an analogous situation, a civil action is commenced by the service of a summons." *People ex rel. Van Der Beek v. McCloskey*, 238 N.Y.S.2d 676, 681 (App. Div. 1963); *see also Bertuglia v. City of New York*, 133 F. Supp. 3d 608, 646–47 (S.D.N.Y. 2015) (explaining that, without "evidence to support the plaintiffs' claim that [two state assistant district attorneys] were manipulating the grand jury process for their own motives . . . or that they used subpoenas to lure witnesses to their offices," absolute immunity barred any claim against them as to the use of their subpoena powers), *aff'd sub nom. Bertuglia v. Schaffler*, 672 F. App'x 96 (2d Cir. 2016) (summary order).

Moreover, the District Attorney's office is empowered to conduct these activities on the grand jury's behalf. *See* N.Y. C.P.L. § 190.50(2) (district attorney may call as witness "any person believed . . . to possess relevant information or knowledge"); *id.* § 190.25(4)(a) (to assist Grand Jury "in conducting its investigation, evidence obtained by a Grand Jury may be independently examined by the district attorney"); *id.* § 190.55(2) (duties and authority of district attorney mandate submission of evidence to Grand Jury under enumerated circumstances); *id.* §§ 610.10(3), 610.25(1) (securing attendance of witnesses by subpoena including requiring such witnesses to produce physical evidence). This is not to say that the issuance of subpoenas is never actionable (as they may involve the prosecutor's investigative function or be issued for an improper purpose). *See, e.g.*, *Rodrigues v. City of New York*, 602 N.Y.S.2d 337, 341 (App. Div. 1993) ("[P]rosecutorial activities that are characterized as administrative or investigative, such as the issuance of grand jury subpoenas, merit less protection."). Indeed, under New York law a "prosecution subpoena must have a purpose beyond mere discovery or to ascertain the existence of evidence." *People v. Doe*, 229 N.Y.S.3d 821, 823 (Sup. Ct. 2024); *People v. Trump*, 209 N.Y.S.3d 922, 922 (Sup. Ct. 2024) (substantively same as to nonparty subpoena in civil case);

*A.S. v. A.B.*, 215 N.Y.S.3d 731, 743 (Sup. Ct. 2024) (substantively same and collecting cases); *see also People v. MacGilfrey*, 733 N.Y.S.2d 254, 256–57 (N.Y. App. Div. 2001) ("While a District Attorney is legally authorized to issue a subpoena duces tecum compelling witnesses to produce evidence before a Grand Jury, here, . . . the . . . records were improperly obtained through the use of such a subpoena since no Grand Jury proceeding concerning defendant was pending . . . and the records were possessed by the police without statutory authority." (citation omitted)). But the lack of direct involvement by the grand jury in the subpoena's issuance is, without more, wholly unremarkable.

With this state-law background, the Court turns to the merits of Defendants' Motion for Summary Judgment.

2. Selective Prosecution

In her Fourth Amended Complaint, Plaintiff alleges that Defendant Walsh and the County of Rockland subjected her to selective prosecution in violation of her Fourteenth Amendment rights under the United States Constitution and analogous rights protected by Section Eleven of the New York State Constitution. (FAC ¶¶ 117–20.) Recognizing that the Court rejected the viability of any claims based on the presentation of the election law charges to the grand jury, *see generally Dominguez*, 2025 WL 618868, at *7–10, Plaintiff contends that she states a viable claim based on the RCDAO's issuance of grand jury subpoenas, alleged surveillance, and obtaining a search warrant for her phone. (*See* Pl.'s Opp'n 41.) Plaintiff's theory, in brief, is that if the investigation into her affairs was carried out with an innocuous motive, then similar investigations should have been targeted at Kohut and Carlevaro, because each was an elected official present at the Polling Place on election day. (*Id.*) The Court

concludes, however, that there is no basis upon which a jury could find that Plaintiff has a viable selective prosecution claim.

> To prevail on a selective prosecution claim a plaintiff must prove that:
>
> (1) the [plaintiff], compared with others similarly situated, was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person.

*Zahra v. Town of Southold*, 48 F.3d 674, 683 (2d Cir. 1995); *accord Kuiken v. County of Hamilton*, 821 F. Supp. 3d 260, 271 (N.D.N.Y. 2026). As to the first prong, Plaintiff contends that she was selectively treated due to the issuance of grand jury subpoenas, alleged surveillance, and obtaining a search warrant for her phone; she says that her purported comparators, Kohut and Carlevaro, were not subject to such investigation. (Pl.'s Opp'n 40–42.) But Defendants correctly point out that multiple of the subpoenas were broad, seeking information not just related to Plaintiff's actions at the Polling Place, but also Carlevaro's and Kohut's actions on that day, as well as Carlevaro's and all the Village Trustees' finances and employment. (*See* Ex. K, at ROCKLAND_000849 ([redacted]); *id.* at ROCKLAND_000618 ([redacted]); *id.* at ROCKLAND_000881–ROCKLAND_000882 ([redacted]); *id.* at ROCKLAND_000896 ([redacted]

Case 7:22-cv-06443-KMK-VR Document 108 *SEALED* Filed 10/30/25 Page 30 of 70

[redacted]); *id.* at ROCKLAND_001026–ROCKLAND_0001027 ([redacted]); *id.* at ROCKLAND_000651 ([redacted]); *id.* at ROCKLAND_034625 ([redacted]); *id.* at ROCKLAND_034613 ([redacted]) So, to the extent that Plaintiff's theory of her selective prosecution claim would require a jury to conclude that the RCDAO's use of subpoenas was "targeted" towards her, it fails: her purported comparators indisputably were also "targeted" by many subpoenas initiated by the RCDAO. And, as outlined above, there is no evidence that would permit a jury to find that any of the Defendants were personally involved in the alleged surveillance.

As the RCDAO evidently issued subpoenas directed at Carlevaro and Kohut's information, too, and as Plaintiff has pointed to no evidence sufficient to support the conclusion that the RCDAO was personally involved in surveillance of her home (except as related to the execution of the search warrant), this leaves only the search warrant itself as a plausible form of "selective treatment." But the choice to execute a warrant for Plaintiff's phone alone—rather than Kohut's and Carlevaro's phones (assuming it can provide the basis for a selective prosecution claim)—is wholly consistent with Defendants' theory of the case. Why would the RCDAO go through the time and expense of executing three search warrants to obtain all three phones, when Plaintiff's phone would (presumably) yield any and all conversations between Plaintiff, Kohut, and Carlevaro on Election Day? Indeed, because the warrant would yield information as to all three Defendants—and, as reflected by the warrant application, was

expressly intended to provide information on each of the three—its being sought is arguably not "selective treatment" at all. (*See* Decl. of Darius Chafizadeh, Esq. in Supp. of Mot. for Partial Summ. J. Ex. W, ¶¶ 29–30 (Dkt. No. 95-23).) In any event, where the only fact that could form the basis of the selective prosecution claim is also consistent with the Defendants' innocent explanation, there is no dispute of material fact. *See Batt v. Buccilli*, 725 F. App'x 23, 26 n.1 (2d Cir. 2018) (summary order) (explaining that, where assertedly inconsistent "remark . . . [was] wholly consistent with [the defendant's] testimony," the comment "raises no material issue of fact as to its reliability" and summary judgment was appropriate); *Golden Pac. Bancorp v. F.D.I.C.*, 375 F.3d 196, 200 (2d Cir. 2004) ("[T]he non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful."); *Nash v. County of Nassau*, No. 16-CV-2148, 2019 WL 1367159, at *1 (E.D.N.Y. Mar. 26, 2019) (concluding, where all of the evidence before the court, even construed most favorably to the plaintiff, supported the defendants' acting with probable cause, the plaintiff's "wholly speculative theory" was "insufficient to create a material issue of disputed fact that would preclude summary judgment"); *Gibbs v. Consol. Edison Co. of New York*, 714 F. Supp. 85, 93 (S.D.N.Y. 1989) (granting summary judgment where "[the] [p]laintiff's evidence simply does not rebut [the] defendant's and [therefore] no genuine issues of material fact exist").

Further, the Court notes also that there is at least some basis to doubt whether Kohut and Carlevaro are adequate comparators to sustain a selective prosecution claim. While the general rule is that the determination whether individuals are, in fact, similarly situated is a matter of fact that should be submitted to the jury, the Second Circuit has explained that a court may grant summary judgment where "no reasonable jury could find the similarly situated prong met." *See*

*Thomas v. Genova*, No. 23-7452, 2025 WL 583182, at *3 (2d Cir. Feb. 24, 2025) (summary order) (quoting *Harlen Assocs. v. Inc. Village of Mineola*, 273 F.3d 494, 499 n.2 (2d Cir. 2001)). As explained, Plaintiff has claimed Kohut and Carlevaro are similarly situated individuals. However, Plaintiff's own Rule 56.1 Counterstatement identifies multiple reasons why these individuals are not effective comparators. While it is disputed whether Kohut served as a poll watcher—indeed, it appears to be the case that he did not—it is undisputed that he did, in fact, receive a poll watcher's certificate. (Pl.'s 56.1 ¶ 41.) And while Plaintiff purports to contest that "Carlevaro was not charged with any crimes . . . because he fully cooperated with the RCDAO's investigation . . . was very forthright" and appeared to "genuinely" have thought that "he could be an election worker" on Election Day, she does not cite any evidence sufficient to contest that narrative. (*Id.* ¶ 72.) Moreover, other uncontested facts not relied on by the Parties appear to further distinguish Kohut and Carlevaro as comparators. Neither Kohut nor Carlevaro was up for reelection in that election cycle. (*See* Ex. GG, at ROCKLAND_001217.) Plaintiff, unlike Kohut and Carlevaro, had been hosting fundraisers for another candidate on the ballot and, Plaintiff does not contest, that "the RCDAO had an 'operational theory,'" (regardless of whether that theory was true or false), "that Plaintiff went to the Haverstraw Polling Place (without voting) to gauge the election results on behalf of" the individual for whom she had been campaigning. (*See* Pl.'s 56.1 ¶¶ 28, 69.) *See Mental Disability L. Clinic, Touro L. Ctr. v. Hogan*, 519 F. App'x 714, 718 (2d Cir. 2013) (summary order) (affirming summary judgment on selective prosecution claim where there was a "rational basis" for treating plaintiff differently from similarly situated persons); *see also Engquist v. Ore. Dep't of Agric.*, 553 U.S. 591, 602 (2008) (explaining that a rational basis for differential treatment is required to defeat a selective

Case 7:22-cv-06443-KMK-VR Document 108 *SEALED* Filed 10/30/25 Page 33 of 70

prosecution claim under a class of one theory). These facts could and may have informed the decision to pursue charges against Plaintiff, rather than against her alleged comparators.

Accordingly, the Court determines that summary judgment for Defendants is appropriate as to Plaintiff's selective prosecution claim.

3. Malicious Prosecution

In order to "state a § 1983 malicious prosecution claim a plaintiff 'must show a violation of his rights under the Fourth Amendment and must establish the elements of a malicious prosecution claim under state law.'" *Rodriguez v. City of New York*, 623 F. Supp. 3d 225, 238 (S.D.N.Y. Aug. 22, 2022) (quoting *Cornelio v. Connecticut*, 32 F.4th 160, 179 (2d Cir. 2022)); *see also Barkai v. Nuendorf*, No. 21-CV-4060, 2023 WL 2691712, at *19 (S.D.N.Y. Mar. 29, 2023) (same). Under New York law, the plaintiff must demonstrate "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in [the] plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for the defendant's actions." *Dettelis v. Sharbaugh*, 919 F.3d 161, 163–64 (2d Cir. 2019) (quotation marks and citation omitted). In addition, to prevail on a cause of action for malicious prosecution under § 1983, the plaintiff must establish that "there was [ ] a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000); *see also Roman v. City of Mount Vernon*, No. 21-CV-2214, 2022 WL 2819459, at *10 (S.D.N.Y. July 19, 2022) ("In addition to the elements of a state-law malicious prosecution claim, however, to state a federal malicious prosecution claim under § 1983, a plaintiff must also have suffered a post-arraignment deprivation of liberty implicating his Fourth Amendment rights."). The Court has already dismissed any claims based on Defendant Walsh's "decision to initiate the prosecution,"

Case 7:22-cv-06443-KMK-VR Document 108 *SEALED* Filed 09/30/26 Page 34 of 70

on the grounds that he "is still absolutely immune from liability [for] such claims." *Dominguez*, 2025 WL 618868, at *8. And, as explained above, Defendant Fitzgerald is not alleged to have any actual involvement in the prosecution. Accordingly, the Court considers whether a malicious prosecution claim is viable as to the remaining Defendants.

"[U]nder New York law, indictment by a grand jury creates a presumption of probable cause that may <u>only</u> be rebutted by evidence that the indictment was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *Ortiz v. Stambach*, 137 F.4th 48, 61 (2d Cir. 2025) (wholly quoting *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003)) (emphasis added); *see also Crespo v. Rivera*, No. 16-CV-708, 2018 WL 4500868, at *11 (S.D.N.Y. Sept. 19, 2018) (same). The Second Circuit has further explained that if there exists "some indication . . . that, as to a fact crucial to the existence of probable cause," defendant police officers "may have lied in order to secure an indictment, and a jury could reasonably find that the indictment was secured through bad faith or perjury, the presumption of probable cause created by the indictment may be overcome." *Manganiello v. City of New York*, 612 F.3d 149, 162 (2d Cir. 2010) (internal quotation marks and citation omitted). "Thus, in order for a plaintiff to succeed in a malicious prosecution claim after indictment, a plaintiff must establish what occurred in the grand jury and to further establish that those circumstances warrant a finding of misconduct sufficient to erode the premise that the [g]rand [j]ury acts judicially." *Franklin v. County of Dutchess*, No. 23-CV-6653, 2026 WL 607798, at *7 (S.D.N.Y. Mar. 4, 2026) (citing *Rothstein v. Carriere*, 373 F.3d 275, 283 (2d Cir. 2004)) (quotation marks omitted); *Colon v. City of New York*, 455 N.E.2d 1248, 1250–51 (N.Y. 1983)).

Further, the Supreme Court in *Rehberg v. Paulk*, 566 U.S. 356, 369 (2012), held that grand jury witnesses, like trial witnesses, are entitled to absolute immunity "from any § 1983

claim based on the witness' testimony." *See also Coggins v. Buonora*, 776 F.3d 108, 112–13 (2d Cir. 2015) (same). The Supreme Court instructed that the rule had a broad sweep, and could not "be circumvented by claiming that a grand jury witness conspired to present false testimony or by using evidence of the witness' testimony to support any other § 1983 claim concerning the initiation or maintenance of a prosecution." *Rehberg*, 566 U.S. at 369. *Rehberg* has cast doubt on whether the presumption of probable cause may be rebutted by "relying on a police officer[']s perjurious testimony before the grand jury." *Crespo*, 2018 WL 4500868, at *12 (wholly quoting *Adamou v. Doyle*, No. 12-CV-7789, 2017 WL 1230541, at *3 (S.D.N.Y. Jan. 12, 2017)); *see also Franklin v. County of Dutchess*, No. 23-CV-6653, 2026 WL 607798, at *8 (S.D.N.Y. Mar. 4, 2026) (same). The district court is to consider whether "the plaintiff can make out the elements of his § 1983 claim without resorting to the grand jury testimony. If the claim exists independently of the grand jury testimony, it is not 'based on' that testimony, as that term is used in *Rehberg*. Conversely, if the claim requires the grand jury testimony, the defendant enjoys absolute immunity under *Rehberg*." *Crespo*, 2018 WL 4500868, at *12 (wholly quoting *Coggins v. Buonora*, 776 F.3d 108, 112 (2d Cir. 2015) (citation omitted)).

In arguing that the presumption of probable cause has been rebutted, Plaintiff contends that "ADA Guccione—who made the Grand Jury presentation—admitted that there was no probable cause to charge Dominguez with electioneering and that Dominguez's mere presence at the poling site was insufficient to establish a crime." (Pl.'s Opp'n 25.) She claims that "when confronted with these facts at her deposition, Guccione could not explain her decision to present the charges to the Grand Jury." (*Id.*) She further makes the following assertions:

> Guccione (1) suggested that Dominguez was running in a contested election, (2) failed to properly charge the Grand Jury on the elements of the crimes charged, (3) failed to inform the jury that Dominguez had a complete defense, and

(4) improperly suggested to the Grand Jury that a judge had already found a proper basis for seizing Dominguez's cell phone.

(*Id.* at 26.) But, in an effort to argue that Guccione engaged in misconduct, Plaintiff misses the forest for the trees: Guccione is entitled to absolute immunity for "prosecutorial activities intimately associated with the judicial phase of the criminal process," including "absolute immunity when . . . *presenting a case to a grand jury* . . . ." *Anilao v. Spota*, 27 F.4th 855 (2d Cir. 2022) (emphasis added). Absolute immunity applies "even if it turns out that state law did not empower [the prosecutors] to bring the charges, so long as they have at least a semblance of jurisdiction that does not run far afield of their job description." *Id.* at 865 (quotation marks omitted). Accordingly, county prosecutors are entitled to absolute immunity "for their prosecutorial and advocative conduct even in the absence of probable cause and even if their conduct was entirely politically motivated." *Id.* at 868. Absolute immunity therefore attaches to the alleged "suggest[ion] that Dominguez was running in a contested election," the grand jury charge, and the (truthful) suggestion that a search warrant had been obtained for Plaintiff's cell phone. (Pl.'s Opp'n at 26.)[12]

Nor can Plaintiff raise a malicious prosecution claim based on the other claims investigated by the RCDAO. The majority of those claims never progressed beyond the investigation phase, and so involved no prosecution, let alone any post-arraignment liberty

---

[12] Further, this testimony was necessary to establish the chain of custody for Plaintiff's cell phone, and was offered with a limiting instruction. (*See* Decl. of Darius Chafizadeh, Esq. in Supp. of Mot. for Partial Summ. J., Ex. EE, at 183:3–84:8 (establishing chain of custody), 186:9–187:8 [redacted] ; Ex. FF, at 199:18–200:21 (establishing chain of custody).) There is nothing untoward about this activity. *See, e.g.*, Fed. R. Evid. 901(a) ("To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is.").

restraint sufficient to implicate the plaintiff's Fourth Amendment rights. *Scott v. City of New York*, No. 19-CV-6289, 2022 WL 846929, at *4 (S.D.N.Y. Mar. 22, 2022) ("There is no evidence of there being any criminal proceeding initiated against [the plaintiff] as a result of his . . . arrest, let alone any post-arraignment deprivation of liberty.").

This appears to leave Plaintiff with only one additional basis upon which she could attempt to raise a malicious prosecution claim: the testimony of Defendant Smith. *See, e.g.*, *Polanco v. City of New York*, No. 14-CV-7986, 2018 WL 1804702, at *8 (S.D.N.Y. Mar. 28, 2018) ("A prototypical example of [facts that can support a malicious prosecution claim] is where police officers provide false information to a prosecutor."); *Boley v. Durets*, No. 12-CV-4090, 2013 WL 6562445, at *7 (E.D.N.Y. Dec. 10, 2013) ("[G]rand jury witnesses are entitled to absolute immunity for § 1983 claims based on their testimony. . . . However, [the] plaintiff can still raise a malicious prosecution claim based on the allegation that defendants knowingly forwarded false evidence to prosecutors."). As explained, such a claim may be viable where it "exists independently of the [officer's] grand jury testimony," and therefore falls outside of the ambit of the rule announced in *Rehberg*. *See Crespo*, 2018 WL 4500868, at *12.[13] But Plaintiff

---

[13] Even if this testimony were properly within the scope of a Section 1983 claim, it is not false. As laid out in the Part I.A, *supra*, and emphasized in Plaintiff's brief, (Pl.'s Opp'n 26), Smith stated that [redacted]. (Decl. of Darius Chafizadeh, Esq. in Supp. of Mot. for Partial Summ. J., Ex. DD, at 27:17.) That Smith did not expressly state that there were two open positions does not mean that the statement is false. [redacted] (Ex. GG, at ROCKLAND_001217 (Ballot Sheet).)

In any event, this statement falls well short of the "fraud" or "perjury" that would overcome the presumption established by the indictment. *See Banyan v. Sikorski*, No. 17-CV-4942, 2024 WL 2137882, at *8–9 (S.D.N.Y. May 13, 2024) (rejecting claim where testimony "certainly was not so replete with issues as to suggest that it was fraudulent, perjurious, or otherwise undertaken in bad faith" where answers were "reconcilable" with alleged inconsistencies and there were innocuous explanations for the divergent accounts), *aff'd*, No. 25-1425, 2026 WL 1074659 (2d Cir. Apr. 21, 2026); *cf. Thompson v. United States*, 604 U.S. 408,

points to no facts independent of the officer's grand jury testimony or the above-described allegations that would provide the basis for a malicious prosecution claim. Accordingly, no reasonable juror could find in favor of Plaintiff on her malicious prosecution claim, because there is no evidence that suffices to rebut the presumption of probable cause established by the indictment.

Further, although Defendants have not raised this point, Plaintiff "does not, and cannot, plausibly allege that the [election law] proceedings terminated in [her] favor," as required to state a claim for malicious prosecution. Simply put, "[i]t is well established in the Second Circuit that an adjournment in contemplation of dismissal does not constitute favorable termination for the purposes of a federal malicious prosecution claim." *Lenzo v. City of New York*, No. 21-CV-306, 2022 WL 656831, at *3 (S.D.N.Y. Mar. 4, 2022); *see also Rothstein v. Carriere*, 373 F.3d 275, 287 (2d Cir. 2004) (holding that an adjournment in contemplation of dismissal pursuant to New York Criminal Procedure Law Section 170.55 extinguishes a malicious prosecution claim "because it is a bargained-for dismissal of the criminal case"); *Ellis v. Gannon*, No. 10-CV-1373, 2011 WL 5513184, at *5 (E.D.N.Y. Nov. 10, 2011) ("[Adjournment in contemplation of dismissal] does not constitute a favorable termination for purposes of a malicious prosecution claim."). Because this was precisely the outcome of Plaintiff's prosecution, there is no basis to find that there was a favorable termination for purposes of the malicious prosecution claim.

---

413 (2025) ("[F]alse and misleading are two different things. A misleading statement can be true. And a true statement is obviously not false. So basic logic dictates that at least some misleading statements are not false." (citations omitted)); *United States v. Lighte*, 782 F.2d 367, 374 (2d Cir. 1986) ("A perjury conviction must rest on the utterance by the accused of a false statement; it may not stand on a particular interpretation that a questioner places upon an answer.").

Accordingly, summary judgment for Defendants is appropriate as to Plaintiff's malicious prosecution claim.

4. First Amendment Retaliation

Defendants contend that Plaintiff's First Amendment claim is not based on a theory that is clearly established under Second Circuit precedent, and therefore the Defendants are entitled to qualified immunity. (Defs.' Mem. 6.) The Court agrees.

To plead a First Amendment retaliation claim, a plaintiff must allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003); *accord Ellis v. Kush*, No. 25-CV-1224, 2025 WL 4643347, at *11 (S.D.N.Y. Dec. 19, 2025), *report and recommendation adopted*, 2026 WL 111951 (S.D.N.Y. Jan. 15, 2026). To the extent that Plaintiff's theory of this claim is premised on her indictment or arrest, the Defendants are entitled to absolute immunity or there is an absence of evidence to support a retaliatory motive as to the specific Defendants involved. To the extent the claim is based on the RCDAO's investigation into her activities, any theory of liability is not clearly established. And to the extent it is based upon surveillance, Plaintiff has not demonstrated a dispute of material fact that any of Defendants *took* that adverse action of surveilling her, because she has not demonstrated facts sufficient to support the conclusion that they were personally involved in any surveillance except as relates to the execution of the search warrant.

a. The Indictment and Arrest

To the extent that Plaintiff is attempting to raise a First Amendment retaliation claim on the theory that the presentation of the charges against her to the grand jury and subsequent arrest

constituted retaliation for her speech, such claim is not viable. As explained in the Court's prior opinion, if this claim were asserted against Walsh, it would be foreclosed by absolute immunity. *See Dominguez*, 2025 WL 618868, at *7 ("To the extent Plaintiff's claims are based on allegations that Walsh initiated the prosecution against her without probable cause or based on false evidence, Walsh is immune from such claims, because . . . the initiation and pursuit of a criminal prosecution are quintessential prosecutorial functions covered by absolute immunity." (quotation marks omitted)); *see also Anilao v. Spota*, 774 F. Supp. 2d 457, 488 (E.D.N.Y. 2011) ("[A]bsolute immunity still applies where a prosecutor brought a case in violation of a defendant's constitutional rights but was otherwise acting within his role as an advocate."), *aff'd*, 27 F.4th 855 (2d Cir. 2022). The same is true as to Defendant Smith's testimony to the grand jury. *See Crespo*, 2018 WL 4500868, at *11 (explaining applicability of absolute immunity afforded grand jury witnesses for any § 1983 claim based on a witness's testimony).

Defendants argue that the First Amendment retaliation claim fails to the extent that it is premised on the actions of Defendants Fitzgerald and Smith in arresting Plaintiff pursuant to a duly issued warrant, as the warrant creates a presumption of probable cause. (Defs.' Mem. 8.) Although the issuance of a warrant creates a presumption of probable cause in the context of a false arrest and malicious prosecution claim, Defendants do not cite cases suggesting that the same is true in the context of a First Amendment retaliation claim, (*id.*), and authority to this effect is sparse.[14] The Court has been able to find a smattering of such cases adopting Defendants' view, albeit in *dicta*. *See, e.g.*, *Sanchez v. Doe*, No. 16-CV-1549, 2018 WL

---

[14] It may be the case that authority is sparse because attempts to bring a First Amendment retaliation claim based on an arrest typically involve warrantless arrests. *See Nieves v. Bartlett*, 587 U.S. 391, 407 (2019) (prototypical case considering whether the existence of probable cause, despite the absence of a warrant, bars a retaliatory arrest claim).

11690961, at *7 (N.D.N.Y. Jan. 3, 2018) ("Defendants correctly argue that the existence of the warrant creates a presumption of probable cause for Israel Bradley's arrest, thereby defeating a First Amendment claim premised on the theory of a retaliatory prosecution."). The cases suggest that the grant of summary judgment on a First Amendment retaliation claim is appropriate where a facially valid warrant exists in the absence of evidence that can defeat the presumption of validity established by the warrant (which evidence, as described further below, is not present here). *See Chavez v. Finney*, No. 19-CV-4109, 2022 WL 874716, at *6 (S.D.N.Y. Mar. 23, 2022) ("[T]he [c]ourt finds that summary judgment is warranted on [the p]laintiff's retaliation claim to the extent it challenges his arrest, because, as [the d]efendants rightly argue, the discovery of the bench warrant supplied probable cause to arrest [the p]laintiff. When an arrest is made pursuant to a facially valid warrant, there is a presumption that it was made with probable cause." (alteration adopted and quotation marks omitted)).

In any event, a second and related deficiency exists as to this claim: there is no evidence suggesting that Defendants Fitzgerald or Smith acted with a retaliatory motive. Plaintiff does not allege that Fitzgerald was involved in the prosecution, nor does she connect her arrest by Fitzgerald and Smith to her speech (except indirectly through Walsh). (*See generally* FAC.) *See Fernandez-Bravo v. Town of Manchester*, 711 F. App'x 5, 8 (2d Cir. 2017) (summary order) (explaining that specific proof of improper motivation is required to survive summary judgment on a First Amendment retaliation claim, and rejecting such a claim based "exclusively on [the plaintiff's] own assertions"); *Barkai*, 2023 WL 2691712, at *29 ("[The p]laintiff's First Amendment claim against [the defendants] falters insofar as he fails to allege a causal nexus between the allegedly retaliatory motive and [the d]efendants' actions where probable cause

existed.”). Accordingly, evidence sufficient to allow a jury to find the requisite motive is absent, and Plaintiff cannot succeed on a First Amendment retaliation claim based on these actions.

b. The Investigation

Insofar as Plaintiff seeks to bring a First Amendment claim based on the RCDAO’s investigation(s) of her activities, it is not settled whether a criminal investigation can constitute an “adverse action” sufficient to sustain a First Amendment retaliation claim. *See Hartman v. Moore*, 547 U.S. 250, 262 n.9 (2006) (“Whether the expense or other adverse consequences of a retaliatory investigation would ever justify recognizing such an investigation as a distinct constitutional violation is not before us.”). To the extent that courts within the Second Circuit have addressed the question, they suggest that an investigation is not sufficient to sustain a First Amendment claim. *See, e.g., Murphy v. Onondaga County*, No. 24-904, 2025 WL 3211007, at *3 (2d Cir. Nov. 18, 2025) (summary order) (“As to [the plaintiff’s] claim of retaliation . . . [the defendant’s] conduct in carrying out a law enforcement investigation into the . . . guards, applying for subpoenas, and seeking warrants constitutes action taken in his official capacity, rather than as a private citizen, . . . . Such conduct is not properly the subject of a First Amendment retaliation claim. Nor has [the plaintiff] adduced sufficient evidence to support a reasonable jury determination that the grand jury investigation was based on [the plaintiff’s] private speech in bringing his lawsuit.” (citation and quotation marks omitted)); *Ellis*, 2025 WL 4643347, at *11 (“The retaliatory prosecution claim fails for the simple reason that [the defendant] never prosecuted [the plaintiff] (i.e., there was no adverse action). A criminal investigation alone does not suffice.” (citations omitted)). Plaintiff urges the Court to differentiate cases premised on “investigation” by characterizing those cases as “limited to the opening of an investigative file,” (Pl.’s Opp’n 13), but they are not. Instead, at least some of

Case 7:22-cv-06443-KMK-VR Document 111 Filed 11/02/26 Page 43 of 70

these cases have considered prosecutor's actions seeking applications for subpoenas and warrants, as well as their "conduct in carrying out a law enforcement investigation," *see Murphy*, 2025 WL 3211007, at *3, and even similar allegations that prosectors "misrepresented facts to the grand jury" and "fabricated charges," *Ellis*, 2025 WL 4643347, at *3. The Court determines that, in the absence of binding Second Circuit precedent or even non-binding district court cases suggesting that this claim is cognizable, Defendants are entitled to summary judgment on this point. *See Brit. Int'l Ins. Co. v. Seguros La Republica, S.A.*, No. 90-CV-2370, 2001 WL 897180, at *3 (S.D.N.Y. Aug. 8, 2001) (granting summary judgment for a defendant where the "[c]ourt c[ould] find no precedent in the caselaw for extending" the applicable "doctrine" to the facts alleged); *Schaeffer v. City of New York*, 889 F. Supp. 97, 102 (S.D.N.Y. 1995) (granting summary judgment for the defendant where, among other issues, the plaintiff "cite[d] no precedent that supports" the conclusion that his claim was viable).

In the alternative, Defendants are at least entitled to qualified immunity on this claim. "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). The Supreme Court has repeatedly held that, in order to satisfy the "clearly established" prong of the test, "existing precedent must have placed the statutory or constitutional question beyond debate." *Taylor v. Barkes*, 575 U.S. 822, 825 (2015) (quotation marks omitted). While it is true that, as Plaintiff urges, there is a clearly established First Amendment right to be free from retaliation, it is *not* clearly established (now or from 2020–2023) that the complained-of conduct can form the basis of a First Amendment retaliation claim. *See Zorn v. Linton*, 607 U.S. 568, 572 (2026) ("To find that a right is clearly established, courts

generally need to identify a case where an officer acting under similar circumstances was held to have violated the Constitution." (quotation marks omitted and alteration adopted)). To the extent that precedent sheds light on the legal question whether these facts can support a retaliation claim, the case law suggests that the conduct *does not* provide the basis of a claim, which surely precludes any such right being clearly established. *See Buckner v. Shumlin*, No. 12-CV-90, 2013 WL 6571814, at *6 (D. Vt. Dec. 13, 2013) (reasoning that in the absence of binding Circuit or Supreme Court authority, and where the majority of courts to have considered the question concluded that "merely initiating an investigation" did not constitute retaliation, qualified immunity applied); *Nance v. Ingram*, No. 14-CV-9, 2015 WL 5725527, at *10 (E.D.N.C. Aug. 7, 2015) (substantially same), *report and recommendation adopted*, 2015 WL 5719590 (E.D.N.C. Sept. 29, 2015).

c. The Surveillance

Qualified immunity for Plaintiff's First Amendment retaliation claim based on the alleged "pervasive surveillance on her and her family" is a closer call. (Pl.'s Opp'n 13.) At the time of the events at issue in this Action, multiple decisions within the Second Circuit held that subjecting individuals to surveillance because of their political engagement was actionable under a First Amendment retaliation theory. *See Black Lives Matter v. Town of Clarkstown*, 354 F. Supp. 3d 313, 325 (S.D.N.Y. 2018) (permitting First Amendment retaliation claim premised on "electronic surveillance" of protestors and "snipers at . . . [a] rally" to proceed); *Marom v. City of New York*, No. 15-CV-2017, 2016 WL 916424, at *11 (S.D.N.Y. Mar. 7, 2016) (holding that the plaintiffs stated a plausible First Amendment retaliation claim by alleging that they were arrested due to their participation in the Occupy Wall Street movement). Whether or not these cases (which are not binding) would suffice to overcome qualified immunity is irrelevant, however.

Where there is "no evidence in the record that the Defendants actually conducted improper surveillance of Plaintiff" that forms the basis of a retaliation claim, such claim must be dismissed at summary judgment. *Dingwell v. Cossette*, No. 17-CV-1531, 2020 WL 5820363, at *8 (D. Conn. Sept. 30, 2020). Beyond Plaintiff's and her relatives' belief that certain individuals were likely affiliated with the RCDAO and that those individuals were surveilling her and her family, she does not adduce evidence that supports the conclusion that such surveillance was actually occurring, let alone that the RCDAO carried it out. *See* Section I.A.3.b, *supra*.[15] Without more,

[15] To conclude that the RCDAO was involved in any of the asserted instances of surveillance would require the Court to heap inference upon inference, without any factual support therefor. For instance, on the day Plaintiff says that she was watched with a friend while having coffee at a park, neither she nor her friend asked the person watching them who he was, and there is no basis for a reasonable juror to conclude that this person was affiliated with the RCDAO. (*See* Pl.'s 56.1 ¶¶ 155–56.) And while Plaintiff alleges that the RCDAO surveilled her family, this claim appears to be based exclusively on family members telling Plaintiff "there were people sitting in front of their homes which . . . didn't look right" and family members saying that they "felt they were being followed" and "felt that there were people sitting in front of their homes." (*Id.* ¶¶ 152–54.) Again, this could not allow a reasonable juror to conclude that RCDAO was at all involved in any surveillance, because it does not provide a factual basis for the conclusion that any such surveillance (if it did occur) was connected to the RCDAO. (*See similarly id.* at ¶¶ 158–60 (claiming that a vehicle was parked outside Plaintiff's house overnight but admitting that Plaintiff did not have the opportunity to speak with the person inside the vehicle before it left, and instead "assume[d] [the individual] w[as] associated with the RCDAO based upon 'the way they were behaving and acting'" (alteration adopted)); *id.* at ¶¶ 161–62 (assuming that two individuals who took photos of Plaintiff's niece's shop and its cameras "due to the way the female and another male individual were behaving" but admitting that "[o]ther than her assumption" there was no basis for this identification).) In each of these incidents, a juror would need to rely on speculation to find in favor of Plaintiff—which is impermissible. *See Marsteller v. Butterfield 8 Stamford LLC*, No. 14-CV-1371, 2017 WL 4286364, at *3 (D. Conn. Sept. 27, 2017) ("Mere speculation and conjecture is insufficient to defeat a motion for summary judgment." (alteration adopted and quotation marks omitted)).

This leaves only the incident where Plaintiff "was having coffee with Trustee Carlevaro and his wife at Starbucks and Trustee Carlevaro pointed out someone he knew to be a police officer that was allegedly watching them." (Pl.'s 56.1 ¶ 157.) To credit the conclusion that this person was a police officer would, of course, involve relying on hearsay for the truth of the matter asserted.

there is "not sufficient evidence that the [RCDAO] conducted improper surveillance of Plaintiff so as to raise a genuine issue of material fact on this issue," and further, there "is no evidence put forward that [any of the Individual] Defendants . . . knew about the[] [alleged surveillance] or were in any way involved in [it]" and so this claim would also fail for lack of personal involvement. *Dingwell*, 2020 WL 5820363, at *8; *see also D'Onofrio v. Westport/Weston Health Dist.*, No. 21-CV-1052, 2024 WL 3595920, at *5 (D. Conn. July 30, 2024) ("Because [the plaintiff] has not proffered any evidence regarding [the individual defendant's] personal involvement, he cannot base his First Amendment retaliation claim against [the defendant] on the impression of surveillance . . . ."), *appeal dismissed*, No. 24-2596 (2d Cir. Dec. 6, 2024).

5. Malicious Abuse of Process

In the operative Complaint, Plaintiff raises an abuse of process claim against Defendant Walsh and Rockland County. (FAC ¶¶ 109–16.) As explained in the Court's prior Opinion:

> "In order to establish liability for malicious abuse of process under § 1983, a plaintiff must establish the claim's elements under state law as well as the deprivation of a constitutional right." *Barkai v. Nuendorf*, No. 21-CV-4060, 2023 WL 2691712, at *35 (S.D.N.Y. Mar. 29, 2023) (quoting *Hoffman v. Town of Southampton*, 893 F. Supp. 2d 438, 446 (E.D.N.Y. Sep. 28, 2012), *aff'd*, 523 F. App'x 770 (2d Cir. 2013)). Under New York law, a plaintiff may assert an abuse of process claim against a defendant who "(1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Savino v. City of New York*, 331 F.3d 63, 76 (2d Cir. 2003) (quoting *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994)).

*Dominguez,* 2025 WL 618868, at *10. The Court further explained, in dismissing Plaintiff's abuse of process claim presented in her Third Amended Complaint, that, "[t]o plead a collateral objective, a plaintiff must plausibly plead not that defendant acted with an 'improper motive,' but rather an 'improper purpose.'" *Id.* (citing *Savino*, 331 F.3d at 77; then citing *Lopez-Motherway v. City of Long Beach*, No. 20-CV-5652, 2021 WL 965158, at *4 (E.D.N.Y. Mar. 15,

2021)). The collateral purpose must extend "beyond or in addition to" the criminal prosecution. *Id.* (emphasis omitted). And in the previous Opinion, the Court rejected the argument that the "collateral objective" element could be supported by Walsh's alleged goal of obtaining "retribution against [Plaintiff] and silencing and discrediting Walsh's enemies, such as [Plaintiff], who he perceive[s] as persons willing or able to disclose information about Walsh's personal misconduct," *id.* (quoting Third Am. Compl. ¶ 106), on the basis that mere allegations of a retaliatory motive are insufficient on their own to demonstrate collateral purpose.

Attempting to avoid the Court's prior basis for dismissal of her claim, Plaintiff claims that Walsh had the "objective of eliminating the Dominguez family's political opposition emanating from his hometown of the Village and Town of Haverstraw," and points to a late-breaking declaration from Plaintiff to the effect that "in 2019, Walsh lost the support of the Village of Haverstraw Democratic Committee and the Town of Haverstraw Democratic Committee" as well as "the popular vote in the Village and Town of Haverstraw"; Plaintiff claims that this hometown loss was fueled by Plaintiff, who was "privy to highly inflammatory, career ending allegations against Walsh for sexual misconduct." (Pl.'s Opp'n 38–39.) To the extent that Plaintiff is attempting to rely on the Court's observation that, in some instances, a "collateral objective" exists sufficient to escape summary judgment where there is "evidence that the defendant believed they were in genuine danger of losing their job," *Dominguez*, 2025 WL 618868, at *10 n.10, Plaintiff has not provided such evidence. Her affidavit and allegations that she heard rumors that Walsh was involved in sexual misconduct are simply insufficient to support the existence of a dispute of material fact that Defendant Walsh believed he was in genuine danger of losing his job. *See Jovanovic v. City of New York*, No. 04-CV-8437, 2010 WL 8500283, at *9–10 (S.D.N.Y. Sept. 28, 2010) (granting summary judgment where the plaintiff

argued that his arrest was carried out "to curry favor with [the defendant's] superiors . . . but offer[ed] no direct evidence of this objective or any other motivation"), *aff'd*, 486 F. App'x 149 (2d Cir. 2012).

In her opposition, Plaintiff cites multiple cases that, she claims, should compel the conclusion that summary judgment on her abuse of process claim is not appropriate. (Pl.'s Opp'n 39–40.) But the cases are distinguishable on several grounds. First, the cases involve different "collateral objectives," for instance: "extort[ing] refunds and financial settlements" and "ruin[ing] [the plaintiff's] business," *Conte v. County of Nassau*, No. 06-CV-4746, 2010 WL 3924677, at *20–21 (E.D.N.Y. Sept. 30, 2010). The difference is that these cases involve coercion of "the plaintiff into doing something other than what the process necessitates." *Johnson v. Town of Greece*, No. 25-CV-6261, 2026 WL 294961, at *5 (W.D.N.Y. Feb. 4, 2026). In her briefing, Plaintiff has not pointed to any collateral objective or effort to compel Plaintiff to do something other than what process would require—she simply points to Walsh's asserted goal of, effectively, "shut[ting] [Plaintiff] up" and "destroy[ing] Plaintiff['s]" reputation, a goal that other courts in this District have stated is simply an improper motive rather than a separate collateral objective. *Mahn v. Allegis Grp.*, No. 24-CV-8326, 2025 WL 3704536, at *7 (S.D.N.Y. Dec. 22, 2025); *see also Savino*, 331 F.3d at 77–78 (concluding that abuse of process claim was not viable where the plaintiff alleged that "in instigating the criminal investigation that led to his indictment, defendants were retaliating against him for the embarrassment caused by the media reports of his allegedly exorbitant overtime pay" because even if the "defendants acted with an improper *motive,*" the plaintiff had presented no evidence that the defendants "had an *ulterior purpose* or *objective* in facilitating his prosecution"). And Plaintiff offers no explanation for how "a defendant . . . commit[ed] some 'further act done outside the use of the process—a

perversion of the process'" as required to sustain an abuse of process claim under New York law. *Mahn*, 2025 WL 3704536, at *7 (quoting *Hauser v. Bartow*, 7 N.E.2d 268, 269 (N.Y. 1937)). The asserted objective—"branding her as a criminal" with the purported motive of "weaking . . . the effectiveness of [her] political opposition," (FAC ¶ 112)—is nothing more than the "use of the process" towards an improper end.

Further, judicially noticeable materials make clear that, in the words of one local news outlet, the 2019 District Attorney election in Rockland County "wasn't a contest." Lanning Taliaferro, *Rockland DA Election: 3-Party Candidate Prevails*, The Patch, (Nov. 5, 2019) https://patch.com/new-york/newcity/rockland-da-election-race-results-reveal-division [https://perma.cc/DC8A-FAB5] (noting that Walsh had been "endorsed by the [C]ounty's three major parties," explaining Zebrowski "stopped campaigning when the Democratic committee endorsed Walsh," and recounting vote counts that indicate Walsh had a commanding victory, outperforming the next-highest-vote-getting candidate by a factor of two); *see also* Annie McDonough, *A good night for Democrats upstate and on Long Island*, City & State New York, (Nov. 6, 2019) https://www.cityandstateny.com/politics/2019/11/a-good-night-for-democrats-upstate-and-on-long-island/176746/ [https://perma.cc/RBD9-3AEP] (reporting that Defendant Walsh won 63.35% of the vote, leading Mike Diederich by a margin of almost 40% and Zebrowski by a margin of almost 50%).[16] So, in addition to the fact that Plaintiff does not

[16] It is well established that election results are judicially noticeable. *See, e.g.*, *Wagschal v. Skoufis*, 442 F. Supp. 3d 612, 617 n.2 (S.D.N.Y. 2020) (taking judicial notice of election results), *aff'd*, 857 F. App'x 18 (2d Cir. 2021); *In re Frito-Lay N. Am., Inc. All Nat. Litig.*, No. 12-MD-2413, 2013 WL 4647512, at *4 (E.D.N.Y. Aug. 29, 2013) (same); *Piccolo v. N.Y.C. Campaign Fin. Bd.*, No. 05-CV-7040, 2007 WL 2844939, at *2 n.2 (S.D.N.Y. Sept. 28, 2007) (same). As the election results no longer appear to be available on the Rockland County website, the Court instead relies on contemporaneous reporting from local news outlets.

plausibly plead a collateral objective—let alone point to evidence sufficient for a juror to find that such an objective existed—Plaintiff's claim, unsupported by vote counts or anyone's opinion but her own, that Walsh was troubled by asserted underperformance in Haverstraw is particularly implausible.

In her FAC, however, Plaintiff points to the asserted collateral objective of "suppress[ing] . . . allegations within the Hispanic community of Haverstraw regarding Walsh's personal misconduct," *i.e.* the allegations of sexual misconduct described in Part I.A.4, *supra*. In at least some circumstances, "covering up" unlawful behavior, "perhaps to forestall personal liability," is treated as "an illegitimate collateral objective for the issuance of criminal process." *Gabilly v. City of New York*, No. 19-CV-11884, 2021 WL 3667981, at *4 (S.D.N.Y. Aug. 17, 2021). *But see Dotson v. Farrugia*, No. 11-CV-1126, 2012 WL 996997, at *8 (S.D.N.Y. Mar. 26, 2012) ("[The] [p]laintiff argues that the allegations . . . were lies made to retaliate against the [p]laintiff for his perceived affront, and an effort to cover up the wrongdoing of the [officers] . . . [this] allege[s] only an improper motive, which is not actionable, rather than an ulterior collateral purpose or objective, which may be." (citation and quotation marks omitted)); *Crews v. County of Nassau*, No. 06-CV-2610, 2007 WL 4591325, at *12 (E.D.N.Y. 2007) ("Because [the] plaintiffs have merely alleged that [the] defendants were motivated by their desire to cover up their misdeeds, but not that [the] defendants had a purpose other than to prosecute [one of the plaintiffs], the abuse of process claim fails."). As explained in the previous Opinion, the Court has serious doubts that "silencing and discrediting" political enemies willing to "disclose information about Walsh's personal misconduct," suffices to constitute a collateral objective here. *Dominguez*, 2025 WL 618868, at *10. But *even assuming* that efforts to cover up Plaintiff's misconduct allegations could constitute a permissible collateral objective, the abuse of

process claim fails. Plaintiff simply has not presented evidence sufficient to support either that Walsh feared the political repercussions of Plaintiff's criticism or was seeking to cover up sexual misconduct. At summary judgment, Plaintiff must introduce evidence "suggestive of Defendants' supposed collateral purpose," or else the claim will be dismissed. *Smith v. City of New York*, No. 21-CV-2280, 2024 WL 2133321, at *5 (E.D.N.Y. May 13, 2024), *reconsideration denied sub nom. Smith v. Barr*, 2024 WL 4957281 (E.D.N.Y. Nov. 12, 2024). If Plaintiff cannot point to some type of evidence beyond her threadbare assertions that the process was, in fact, in pursuit of the collateral objective, abuse of process claims are dismissed at summary judgment. *See, e.g.*, *Kanciper v. Lato*, 718 F. App'x 24, 28–29 (2d Cir. 2017) (summary order) (affirming dismissal of abuse of process claim based on asserted collateral purpose of "furth[ering] . . . friendships" where the sole basis for that purpose was "[t]he mere fact that [the defendant] was friends" with those individuals); *Conte*, 2010 WL 3924677, at *20–21 (denying summary judgment in case involving complaining witness who requested that the prosecution be dropped, internal memorandum reflecting that prosecutors asked whether the plaintiff might pay restitution in exchange for the prosecution being dropped, specific averments by the plaintiff that the defendants expressly told him that the charges would be dropped in exchange for payment, and threatening statements suggestive of the possibility of blackmail or retribution made in conjunction with delivery of subpoena); *Dash v. Montas*, 612 F. Supp. 3d 138, 154 (E.D.N.Y. 2020) ("[T]hough [the p]laintiff alleged that [the d]efendants were motivated by racial animus in arresting him, he has failed to put forth any evidence to support that claim. Without evidence that [the d]efendant . . . harbored any personal animus toward Plaintiff or acted with some other collateral objective—i.e., one not related to law enforcement—in arresting Plaintiff, Plaintiff's claim for malicious abuse of process cannot succeed."); *cf. Smith*, 2024 WL

2133321, at *4–5 (dismissing claim at summary judgment where motive was based on the plaintiff's assertion that the defendants had a collateral purpose of furthering the reputation of their police unit and there was "no evidence in the record" supporting that theory). No such evidence is present here: instead, "even drawing all permissible inferences in [Plaintiff's] favor," it is not reasonable to infer "that Defendants" used process to "obtain a collateral objective that is outside the legitimate ends of the process." *See Grytsyk v. Morales*, No. 19-CV-3470, 2023 WL 6122693, at *10 (S.D.N.Y. Sept. 19, 2023) (quotation marks omitted). Summary judgment against Plaintiff is therefore appropriate on the abuse of process claim.

6. Excessive Force and Assault and Battery Claims against Defendant Walsh

Defendant Walsh argues that he cannot be held liable on the excessive force and assault and battery claims because there is no dispute of material fact as to his involvement in any use of excessive force against Plaintiff. (Defs.' Mem. 1–4.) The Court agrees.

"[I]t is well settled that, in order to establish a defendant's individual liability in a suit brought under [42 U.S.C.] § 1983, a plaintiff must show, inter alia, the defendant's personal involvement in the alleged constitutional deprivation." *Morabito v. New York*, 803 Fed. App'x 463, 466 (2d Cir. 2023) (summary order) (quoting *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013)). To assert successfully an excessive force claim against a supervising officer, it is not sufficient alone that the individual "was aware of the . . . incident"; instead, a claim may lie where that individual "affirmatively directed the arresting defendants to use excessive force on [the p]laintiff," *Salaman v. City of New Haven*, No. 19-CV-577, 2019 WL 2231223, at *4 (D. Conn. May 23, 2019), or where that individual was aware that excessive force might be used by others, *Felciano v. Town of E. Hartford*, No. 18-CV-1932, 2023 WL 4826465, at *6 (D. Conn. July 27, 2023) ("[C]ourts have dismissed [excessive force] claims

[against supervisors] where there was no evidence that the supervisor ordered the arresting officers to use excessive force, nor that the supervisor was aware those officers might use such force."); *Sash v. United States*, 674 F. Supp. 2d. 531, 544–45 (S.D.N.Y. 2009) (dismissing claim premised on use of force when the plaintiff did not "contend that [the supervisory defendants] ordered [the other defendants] to use excessive physical force" or that the supervisory defendants were present and had knowledge other defendants would use excessive force).

In her opposition to summary judgment, Plaintiff argues that "Walsh was personally involved in *all* aspects" of the actions taken regarding Plaintiff. (Pl's Opp'n 7.) She contends that her claim does not rely on "the mere fact that [Defendants] Fitzgerald and Smith happened to fall under Walsh's chain of command or that Walsh was [their] 'mere supervisor' . . . ." (*Id.* at 9.) She points to Walsh's admission that he had "hard feelings" toward Dominguez at the time of the arrest; testimony that Walsh "knew about and planned the . . . arrest," the location of the arrest near Walsh's office and away from cameras, his involvement in the decision that she be arrested (rather than given a summons), and the involvement of individuals who worked for the RCDAO in her arrest. (*Id.* at 9–11.) But none of these facts provides support for the premise that Walsh was personally involved in and/or directed the use of *excessive force* against Plaintiff, even if they provide support that he was personally involved in and/or directed the decision that she be *arrested*. *See Simmons v. Ferrigno*, No. 17-CV-6176, 2023 WL 5983797, at *14 (W.D.N.Y. Sept. 14, 2023) (granting summary judgment where the plaintiff "failed to come forward with any evidence demonstrating that [a supervisor] was personally involved in his allegedly false arrest and is therefore subject to liability under § 1983," nor "evidence that he was either present during the arrest, in communication with the arresting officers during the arrest, or otherwise directly involved in the arrest"); *Felciano*, 2023 WL 4826465, at *6

(granting summary judgment where the parties did "not dispute that none of the supervisory defendants was present during [the p]laintiff's arrest and the alleged excessive use of force," nor offer "any evidence that the[ supervisory] defendants directed the alleged use of force" nor any "prior documented complaints of excessive force against" the arresting officers); *Savarese v. City of New York*, 547 F. Supp. 3d 305, 354 (S.D.N.Y. 2021) (granting summary judgment where supervising officer wanted the plaintiff arrested and "authorized" that arrest, but did not effectuate or otherwise cause the arrest). As Plaintiff has not pointed to any admissible evidence sufficient to support the conclusion that Walsh was personally involved in the use of force in her arrest, or ordered the use of such force, or was aware of any prior use of excessive force by the arresting officials, the excessive force and assault and battery claims against him based on that arrest necessarily fail.

7. False Arrest Claim

a. Defendant Walsh and Absolute Immunity

In the Court's February 26, 2025 Order, the Court held that Defendant Walsh had absolute immunity as to Plaintiff's false arrest claim asserted against him, as the facts giving rise to the claim occurred after the prosecution began. *Dominguez*, 2025 WL 618868, at *8. Although Plaintiff has since amended her complaint to address the deficiencies identified in that Opinion, the FAC provides no basis to conclude that the arrest occurred *prior to* absolute immunity attaching. (*See* FAC.) As the Court has already explained: Walsh is absolutely immune as to claims based on "the conduct that Plaintiff alleges occurred after the Election Law prosecution was begun—specifically, that Walsh vindictively misused and abused the powers of his office to arrange for the . . . arrest of Plaintiff." *Dominguez v. Walsh*, 2025 WL 618868, at *8 (alteration adopted and quotation marks omitted). "[C]ourts have found" repeatedly "that

Case 7:22-cv-06443-KMK-VR Document 108 *SEALED* Filed 09/30/26 Page 55 of 70

prosecutors are entitled to absolute immunity for directing arrests after a prosecution was initiated." *Id.* (collecting cases).

b. Privilege

In addition to Defendant Walsh's absolute immunity, Defendants move for summary judgment on the false arrest claims on the basis that the confinement was privileged, given the presumption of probable cause established by the arrest warrant. (*See* Defs.' Mem. 4–6.) The Court agrees that Plaintiff has not pointed to evidence sufficient to establish a dispute of material fact that would overcome the presumption of privilege established by the warrant at this stage of the proceedings.

When analyzing claims under 42 U.S.C. § 1983 for false arrest, the Second Circuit applies the law of the state in which the arrest occurred, in this case, New York. *Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006). "Under New York law, a plaintiff claiming false arrest must show that . . . the confinement was not otherwise privileged." *Uviles v. City of New York*, No. 19-CV-3911, 2020 WL 8642289, at *1 (E.D.N.Y. June 30, 2020) (quotation marks and citation omitted); *see also Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012) (same); *Reid v. Dumberger*, No. 17-CV-1124, 2018 WL 840092, at * 5 (S.D.N.Y. Feb. 12, 2018) (same); *Holland v. City of Poughkeepsie*, 935 N.Y.S.2d 583, 589 (N.Y. App. Div. 2011) (same).[17] An arrest "is privileged when it is made pursuant to a warrant valid on its face, or

---

[17] Plaintiff claims that the "burden of proving privilege or justification for the arrest is on the party asserting the privilege or justification." (Pl.'s Opp'n 11.) However, the burden is so allocated when the arrest occurs *without a warrant* having issued. *See Scott v. City of New Rochelle*, 986 N.Y.S.2d 819, 833 (Sup. Ct. 2014) ("[W]hen an arrest is made without a warrant, as here, a presumption arises that it was unlawful, and the burden of proving justification is cast upon the defendant[.]"). Here, a warrant issued, which establishes a presumption of validity that must be overcome by *Plaintiff's* demonstration that the arrest was not privileged. *See Adams v. Co-Op City Dep't of Pub. Safety*, No. 21-CV-2675, 2025 WL 4722465, at *13 (S.D.N.Y. Sept.

when it is based on probable cause." *Uviles*, 2020 WL 8642289, at *1; *see also Guan v. City of New York*, 37 F.4th 797, 804 (2d Cir. 2022) (explaining that probable cause provides "a complete defense to a false arrest claim"); *Torres v. City of N.Y.*, No. 09-CV-9357, 2016 WL 3748492, at *3 (S.D.N.Y. July 11, 2016) (explaining that the existence of "probable cause based on an outstanding warrant" likewise provides a complete defense to a false arrest claim); *see also Lyman v. Town of Amherst*, 903 N.Y.S.2d 626, 627–28 (N.Y. App. Div. 2010) (explaining arrest made pursuant to a facially valid warrant is privileged).

An arrest warrant "is valid on its face when it follows the statutory form contained in New York CPL § 120.10." *Okoroafor v. City of New York*, No. 07-CV-9387, 2013 WL 5462284, at *3 (S.D.N.Y. Sept. 25, 2013) (citing *Boose v. Rochester*, 421 N.Y.S.2d 740, 746 (App. Div. 1979)) (alteration adopted); *see People v. Dodt*, 462 N.E.2d 1159, 1163 (N.Y. 1984) (discussing statutory form of a valid arrest warrant contained in N.Y. CPL § 120.10). "[T]he issuance of a warrant by a neutral magistrate, which depends on a finding of probable cause, creates a presumption that it was objectively reasonable for the officers to believe that there was probable cause." *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991); *see Mara v. Rilling*, 921 F.3d 48, 73 (2d Cir. 2019) (noting that an arrest pursuant to a warrant is presumed to be supported by probable cause); *Nieves v. City of New York*, No. 22-CV-10204, 2024 WL 1363570, at *3 (S.D.N.Y. Mar. 29, 2024) (explaining that the issuance of a warrant by a neutral

---

17, 2025) (explaining that the warrant establishes a rebuttable presumption, which shifts the burden to the plaintiff to "show that [the] warrant was obtained by fraud or was 'facially invalid'"), *report and recommendation adopted*, 2026 WL 446218 (S.D.N.Y. Feb. 17, 2026), *motion for relief from judgment denied*, 2026 WL 579339 (S.D.N.Y. Mar. 2, 2026). The cases relied on by Plaintiff, (*see* Pl.'s Opp'n 11), are wholly inapposite: *Russo v. City of Bridgeport*, 479 F.3d 196 (2d Cir. 2007), applied Connecticut law, while *Hollender v. Trump Vill. Co-op., Inc.*, 448 N.E.2d 432 (N.Y. 1983), involved a false imprisonment and malicious prosecution claim.

magistrate based on a finding of probable cause establishes a presumption that it was reasonable for the officers to believe that probable cause existed). If there is insufficient evidence to support the conclusion that a valid arrest warrant existed, the arrest may nevertheless be privileged if a defendant submits sufficient evidence, on summary judgment, "that would allow a rational jury to find that [the defendant] had . . . probable cause to make an arrest." *Okorafor*, 2013 WL 5462284, at *3.

Defendants have produced a facially valid arrest warrant. (*Compare* Decl. of Darius Chafizadeh, Esq., Ex. II (Dkt. No. 95-35) *with* N.Y. CPL § 120.10.) This warrant establishes a presumption of probable cause, including at summary judgment. *See Brown v. Village of Endicott*, No. 21-CV-1186, 2025 WL 863105, at *26 (N.D.N.Y. Mar. 19, 2025) (explaining presumption); *May v. Levy*, 659 F. Supp. 3d 323, 336 (E.D.N.Y. 2023) (same); *Ellsworth v. City of Gloversville*, 703 N.Y.S.2d 294, 296 (App. Div. 2000) (describing operation of the presumption at summary judgment stage).[18]

To rebut this presumption, Plaintiff would need to present evidence that "the warrant was obtained by fraud or was facially invalid." *Brown*, 2025 WL 863105, at *26; *see also Vasquez v. Reilly*, No. 15-CV-9528, 2017 WL 946306, at *7 (S.D.N.Y. Mar. 9, 2017) ("A plaintiff can demonstrate that [his right to be protected against false arrests] was violated where the officer submitting the probable cause affidavit 'knowingly and intentionally, or with reckless disregard

---

[18] The same presumption is established by Plaintiff's having been indicted on the election law charges. *See May v. Levy*, 659 F. Supp. 3d 323, 336 (E.D.N.Y. 2023) (citing *Manganiello*, 612 F.3d at 162) ("Probable cause may also be presumed where an arrest occurs following an indictment."). The analysis is identical. *See Manganiello*, 612 F.3d at 162 (explaining the presumption is rebuttable only "by evidence that the indictment was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith" (internal quotation marks and citation omitted)).

for the truth, made a false statement in his affidavit' or omitted material information, and that such false or omitted information was 'necessary to the finding of probable cause.'" (citing *Soares v. Connecticut*, 8 F.3d 917, 920 (2d Cir. 1993))). Plaintiff has not raised any facial objection to its validity, nor could she, as the warrant "appears regular on its face," and the Court can discern no basis by which a "police officer [could] look at the face of the warrant and plainly see that it is unenforceable." *Hurley v. Town of Southampton*, No. 17-CV-5543, 2021 WL 966295, at *6 (E.D.N.Y. Feb. 10, 2021). Instead, Plaintiff appears to argue that the warrant was obtained by fraud. To meet this burden, Plaintiff points to the same materials that she cites to support her malicious prosecution claim—namely, Guccione's handwritten notes on the draft, her claim that Guccione did not adequately explain to the grand jury that the election was contested, the grand jury charge, and the reference to the warrant issued for Plaintiff's cell phone, which was discussed to lay a foundation for the introduction of the materials obtained from the cell phone. (Pl.'s Opp'n 12, 26.)

As to the notes, Plaintiff does not adequately explain how they establish fraud. The Court concludes that the notes do not introduce a dispute of material fact as to the validity of the warrant for several reasons. First, there is no basis upon which a reasonable juror could conclude that the failure to disclose the ADA's *legal conclusion* that probable cause did not exist at the time of the earlier draft would constitute "omitted information . . . necessary to the finding of probable cause" such that it could overcome the presumption established by the warrant. *Vasquez*, 2017 WL 946306, at *7; *cf. Robinson v. Golden*, No. 19-CV-406, 2022 WL 1224446, at *4 (N.D.N.Y. Apr. 26, 2022) (explaining that, even where a confidential informant lied, where a warrant applicant incorporating that lie accurately represents the erroneous information provided, probable cause is not defeated). Second, the draft of the warrant application was just

that: a draft. It was not the version presented to the judge, and so the conclusion that *the earlier* application lacked probable cause as to some charges is not necessarily probative of the existence of probable cause as to the *later* application. Third, the prosecutor "enjoys absolute immunity when determining which offenses to charge," and it is difficult to contemplate that the prosecutor's evaluation of her own case as reflected in her notes does not fall within the scope of that immunity. *Anilao*, 27 F.4th at 864. Finally, and in any event, the determination of probable cause was the reviewing judge's to make, not ADA Guccione's. *See, e.g.*, *United States v. Turner*, 558 F.2d 46, 50 (2d Cir. 1977) (emphasizing that the critical protection, for Fourth Amendment purposes, is the magistrate judge's "substantive tasks of determining probable cause and authorizing the issuance of the warrant" and that "[a]s long as the magistrate in fact performs" those tasks "the amendment is satisfied"). Unless Plaintiff points to some inclusion of false information or omission of true information that was sufficiently central to constitute fraud, then the ADA's assessment of the existence of probable cause is, frankly, immaterial.

As the Court has already explained, a prosecutor is absolutely immune for her advocacy. *See* Section II.B.3, *supra*. This includes the presentation of evidence to the grand jury (such as testimony about [redacted]), and the presentation of the prosecutor's case to the grand jury, which obviously includes the jury charge. *See Anilao*, 27 F.4th at 864 (noting absolute immunity encompasses "determining which offenses to charge, initiating a prosecution, presenting a case to a grand jury, and preparing for trial"); *Dieter v. Quintilone*, 764 F. App'x 71, 73 (2d Cir. 2019) (explaining that a prosecutor was absolutely immune for the "creation of the essential grand jury record," as well as for the prosecutor's "statement to the grand jury regarding the relative importance" of certain evidence); *Perkins v. Solomon*, 821 F. Supp. 3d 395, 407–08 (E.D.N.Y. 2026) (noting that the distinguishing line is whether the "challenged

prosecutorial action took place before or after prosecutors had probable cause to effect an arrest”).

In light of the foregoing, Plaintiff has not demonstrated a dispute of material fact as to her false arrest claim.

8. Screw in Tire Incident

To the extent that any of Plaintiff’s claims are premised on the incident purportedly involving the placement of a screw in her tire, *see* Section I.A.3.b, *supra*, Defendants argue that Plaintiff has not demonstrated facts sufficient to permit a jury to find that any Defendant was personally involved in this activity. (*See* Defs.’ Mem. 24–25.) The Court agrees. Moreover, in her opposition brief Plaintiff has not raised any counterargument as to Defendants’ lack of personal involvement in this incident, or otherwise opposed Defendants’ argument to dismiss any claims based on these facts. (*See generally* Pl.’s Opp’n.) The Court therefore also deems any such claims to be abandoned. *See Banyan v. Sikorski*, No. 17-CV-4942, 2021 WL 2156226, at *2 (S.D.N.Y. May 27, 2021) (collecting cases deeming arguments abandoned in similar circumstances).

9. Section 1983 Claims against the County

Defendants argue that the County, too, is entitled to summary judgment on each of Plaintiff’s claims brought pursuant to § 1983. (*See* Def.’s Mem. 28–29.) In opposition, Plaintiff argues that the County is liable for Walsh’s actions in his investigative capacity, and that Walsh constituted a final policymaker on the County’s behalf. (Pl.’s Opp’n 43.) The Court agrees that the County is entitled to summary judgment on each of Plaintiff’s claims asserted pursuant to § 1983.

"To state a claim under [§ 1983], the plaintiff must show that a defendant, acting under color of state law, deprived him of a federal constitutional or statutory right." *Taranto v. Putnam County*, No. 21-CV-2455, 2023 WL 6318280, at *15 (S.D.N.Y. Sept. 28, 2023) (quoting *Sykes v. Bank of Am.*, 723 F.3d 399, 405–06 (2d Cir. 2013)). Nevertheless, "Congress did not intend municipalities to be held liable [under § 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). "Thus, 'to prevail on a claim against a municipality under [§] 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury.'" *Taranto*, 2023 WL 6318280, at *15 (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008)); *see also Fecteau v. City of Mount Vernon*, No. 23-CV-9173, 2025 WL 873018, at *7 (S.D.N.Y. Mar. 20, 2025) (same); *Williams v. Lohard*, No. 20-CV-10571, 2022 WL 269164, at *3 (S.D.N.Y. Jan. 28, 2022) ("[The] [p]laintiff's claim against the [c]ity fails for lack of facts supporting the existence of a municipal policy or practice." (citing cases)); *Palmer v. City of New York*, 564 F. Supp. 3d 221, 240 (E.D.N.Y. 2021) (dismissing claim against city where the plaintiffs failed to "sufficiently allege[ ] that they suffered constitutional violations as a result of an official policy or custom" (quotation marks omitted)).

This multi-factor test, and particularly the requirement that "an official policy of the municipality caused the constitutional injury," *Taranto*, 2023 WL 6318280, at *15, reflects the notion that "a municipality may not be held liable under § 1983 solely because it employs a tortfeasor," *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997); *see also Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986) (holding that a municipality may not be

liable under § 1983 "by application of the doctrine of respondeat superior" (italics omitted)); *Vassallo v. Lando*, 591 F. Supp. 2d 172, 201 (E.D.N.Y. 2008) (noting that "a municipal entity may only be held liable where the entity *itself* commits a wrong" (emphasis in original)); *Newton v. City of New York*, 566 F. Supp. 2d 256, 270 (S.D.N.Y. 2008) ("As subsequently reaffirmed and explained by the Supreme Court, municipalities may only be held liable when the municipality itself deprives an individual of a constitutional right."). Instead, there must be a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1988) ("[G]overnments should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights.").

"In determining municipal liability, it is necessary to conduct a separate inquiry into whether there exists a 'policy' or 'custom.'" *Kiss v. Torres*, No. 21-CV-10391, 2024 WL 1210941, at *20 (S.D.N.Y. Mar. 19, 2024) (quoting *Davis v. City of New York*, 228 F. Supp. 2d 327, 336 (S.D.N.Y. 2002)). Normally, "a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the [municipality]." *Newton*, 566 F. Supp. 2d at 271; *see also City of Okla. City v. Tuttle*, 471 U.S. 808, 823–24 (1985) (plurality opinion) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."); *Bird v. County of Westchester*, No. 20-CV-10076, 2022 WL 2263794, at *12 (S.D.N.Y. June 23, 2022) ("[The] [p]laintiff fails to allege the existence of any other similar incident, which dooms [the p]laintiff's claim because a custom or policy cannot be shown by

pointing to a single instance of unconstitutional conduct by a mere employee of the municipality." (citation and quotation marks omitted)); *Santana v. City of New York,* No. 15-CV-6715, 2018 WL 1633563, at *10 (S.D.N.Y. Mar. 29, 2018) ("[A] 'single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy.'") (quoting *DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir. 1998)); *Brogdon v. City of New Rochelle*, 200 F. Supp. 2d 411, 427 (S.D.N.Y. 2002) ("A single incident by itself is generally insufficient to establish the affirmative link between the municipal policy or custom and the alleged unconstitutional violation.").

In some contexts, a district attorney may be treated as a county policymaker. *See Pinaud v. County of Suffolk*, 52 F.3d 1139, 1153–54 n.14 (2d Cir. 1995) ("[W]here a district attorney acts as the manager of the district attorney's office, the district attorney acts as a county policymaker."); *see also Conte*, 2010 WL 3924677, at *27 (explaining situations in which district attorneys may be treated as policymakers for *Monell* purposes). The operative distinction appears to be whether the plaintiff's "claims center not on decisions whether or not, and on what charges, to prosecute but rather on the administration of the district attorney's office." *Pinaud*, 52 F.3d at 1153 n.14 (alteration adopted). If the claims center on the latter, liability for the County may lie. *Id.* This includes where the district attorney "direct[s] the police and ADAs to engage in unconstitutional investigative procedures." *Kellner v. City of New York*, No. 17-CV-1268, 2021 WL 4251343, at *17 (E.D.N.Y. Sept. 17, 2021) (citing *Myers v. County of Orange*, 157 F.3d 66, 77 (2d Cir. 1998)). However, this does not relieve Plaintiff of demonstrating a "direct causal link" between the District Attorney's alleged mismanagement and the purported "misconduct and constitutional deprivations involving . . . [P]laintiff[]." *Anilao*, 27 F.4th at 874. There is "no evidence in the record from which a rational jury could find that [Defendant Walsh]

Case 7:22-cv-06443-KMK-VR Document 108 *SEALED* Filed 10/30/25 Page 64 of 70

violated [Plaintiff's] constitutional rights during the investigative phase." *Anilao v. Spota*, 340 F. Supp. 3d 224, 250 (E.D.N.Y. 2018) (footnote omitted).

It is virtually impossible to make out Plaintiff's *Monell* theory from the FAC and opposition brief. (*See* FAC ¶¶ 121–26 (alleging simply that Walsh had final policymaking authority and that Rockland County is liable); Opp'n Br. 43 ("Even if Walsh is entitled to absolute immunity for his decision to indict and prosecute, Walsh is not entitled to immunity for his investigative actions before probable cause had been established. Accordingly, the County of Rockland can be held liable for Walsh's investigative conduct as a final policymaker.").) Read generously, perhaps these allegations gesture at a theory that Walsh, as the final policymaker, took "actions . . . that caused the particular deprivation" alleged here. *Jones v. Westchester County*, 182 F. Supp. 3d 134, 158 (S.D.N.Y. 2016). Although Plaintiff is represented by counsel and not entitled to such liberal interpretation, *see Quirino v. The New Jewish Home*, No. 19-CV-5778, 2021 WL 11430534, at *7 (S.D.N.Y. Dec. 29, 2021), *report and recommendation adopted*, 2022 WL 142373 (S.D.N.Y. Jan. 14, 2022), the Court will assume that this theory undergirds her *Monell* claims.

To the extent that the claim is premised on Walsh's decision to prosecute Plaintiff, he acted as a representative of the State rather than the County. *See, e.g.*, *Bellamy v. City of New York*, 914 F.3d 727, 759 (2d Cir. 2019) ("We have been consistent in holding that the actions of county prosecutors in New York are generally controlled by municipal policymakers for purposes of *Monell*, with a narrow exception emanating from *Baez* being the decision of whether, and on what charges, to prosecute."); *Myers*, 157 F.3d at 77 ("New York courts recognize a narrow exception to this general rule when a prosecutor makes individual determinations about whether to prosecute violations of state penal laws."); *Baez*, 853 F.2d at 77

("When prosecuting a criminal matter, a district attorney in New York State, acting in a quasi-judicial capacity, represents the State not the county."); *Morris v. Martin*, No. 16-CV-601, 2017 WL 1047328 (N.D.N.Y. Jan. 5, 2017) ("[W]hen prosecuting a criminal matter, a district attorney represents the State, not the County, and the County cannot be said to be responsible for the district attorney's misconduct in an individual determination about whether to prosecute violations of state penal laws." (quotation marks omitted)), *report and recommendation adopted*, 2017 WL 1090019 (N.D.N.Y. Mar. 22, 2017). This point of law disposes of any potential *Monell* liability for Plaintiff's First Amendment retaliation claim premised on her indictment, *see* Section II.B.4.a, *supra*.

"Where a plaintiff relies not on a formally declared or ratified policy, but rather on the theory that the conduct of a given official represents official policy, it is incumbent on the plaintiff to establish that element as a matter of law." *Jeffes v. Barnes*, 208 F.3d 49, 57–58 (2d Cir. 2000); *see also Baity*, 51 F. Supp. 3d at 437 (same). Thus, in order for the County to be liable for Walsh's actions, Plaintiff must demonstrate that Walsh "was a policymaker with respect to the particular issue involved here." *Baity*, 51 F. Supp. 3d at 437 (internal quotation marks omitted). Furthermore, "[i]t is well settled in th[e Second] Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Tieman v. City of Newburgh*, No. 13-CV-4178, 2015 WL 1379652, at *25 (S.D.N.Y. Mar. 26, 2015) (internal quotation marks omitted). Courts have construed "personal involvement" to mean "direct participation, or failure to remedy the alleged wrong after learning of it, or creation of a policy or custom under which unconstitutional practices occurred, or gross negligence in managing subordinates." *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996); *see also Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001) (holding that

"'direct participation' as a basis of liability in this context requires intentional participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal" (footnote omitted)). The above-described failure to allege facts sufficient to support Walsh's personal involvement in the asserted excessive force claim, the assault and battery claim, or any claims premised on the surveillance of Plaintiff, means that the County, too, cannot be held liable on those claims. *See, e.g.*, *Scalpi v. Town of E. Fishkill*, No. 14-CV-2126, 2016 WL 858955, at *7 (S.D.N.Y. Feb. 29, 2016) (holding that the failure to establish facts that connect a defendant district attorney to the actions that gave rise to the plaintiff's cause of action defeats a *Monell* claim premised on that defendant's asserted policymaking role); *O'Connor v. Barnes*, No. 97-CV-1489, 1998 WL 1763959, at *6 (N.D.N.Y. Mar. 18, 1998) (noting that a county policymaker "must *be personally* and directly involved in the constitutional deprivation for the municipality to be considered the 'moving force' behind the deprivation" and open the county to *Monell* liability based on that policymaker's actions).

As to Plaintiff's selective prosecution, malicious prosecution, malicious abuse of process, and false arrest claims, as well as Plaintiff's First Amendment retaliation claim premised on the investigative activity, there can be no *Monell* liability because the elements of the underlying offenses have not been established. *See* Sections II.B.2, II.B.3, II.B.4.b, II.B.5, II.B.7.b, *supra*. *See McClanahan v. Kelly*, No. 12-CV-5326, 2014 WL 1317612, at *7 (S.D.N.Y. Mar. 31, 2014) ("[W]hen the claims against an individual defendant are dismissed, the claims against the City must also be dismissed, given that a [p]laintiff's *Monell* claims are derivative of his claims against the individual defendants." (citing, among other sources, *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)); *see also Pinter v. City of New York*, 448 F. App'x 99, 106 (2d Cir. 2011) (summary order) (holding where "*Monell* claims [we]re derivative of [the plaintiff's]

claims against the individual defendants," that "any claims dismissed as against the individual defendants must also be dismissed as against the City").

Accordingly, Rockland County is entitled to summary judgment on these claims.[19]

10. State Law Claims

In addition to the above-described federal claims, Plaintiff asserts violations of her right to freedom of speech under Section Eight of the New York State Constitution, (FAC ¶ 100), her right to be free from malicious prosecution, (*id.* ¶ 107), abuse of process, (*id.* ¶ 116), and selective prosecution, (*id.* ¶ 118), under the New York State Constitution. She also brings claims for assault and battery, (*id.* ¶ 128), malicious prosecution, (*id.* ¶ 130), abuse of process (*id.* ¶ 132), and false arrest, (*id.* ¶ 134), under New York State common law.

Defendants argue that they are entitled to summary judgment as to Plaintiff's state-law claims that correspond to the above-described federal claims, on the basis that "no private right of action exists for violations of the New York State Constitution where the plaintiff has an alternative remedy under § 1983 for violations of parallel provisions of the U.S. Constitution." *Buari v. City of New York*, 530 F. Supp. 3d 356, 408 (S.D.N.Y. 2021). (*See* Def.'s Mem. 27 (same, quoting *Buari*).) In her opposition brief, Plaintiff does not contest this point. (*See generally* Pl.'s Opp'n.)

---

[19] It bears noting that Defendants take the incorrect position that Walsh's absolute immunity would apply to the County as well. (Reply 16 ("Plaintiff also concedes that the County cannot be liable on a 'policy maker' theory to the extent that DA Walsh is entitled to absolute immunity for the decision to seek an indictment and prosecute those charges.").) This premise is incorrect: "Immunity may shield an official from suit, but that immunity does not extend to county or municipal defendants because 'municipalities do not enjoy immunity from suit—either absolute or qualified—under § 1983.'" *Baker v. Spinner*, No. 18-CV-950, 2019 WL 3430918, at *7 (N.D.N.Y. July 30, 2019) (quoting *Pinaud*, 52 F.3d at 1153), *aff'd*, 826 F. App'x 105 (2d Cir. 2020).

"Where a complaint alleges no theories of liability that are cognizable exclusively under the New York State Constitution, any claims brought under the state constitution are ordinarily dismissed." *Talarico v. Port Auth. of N.Y. & N.J.*, 367 F. Supp. 3d 161, 171–72 (S.D.N.Y. 2019). However, Courts within the Second Circuit conclude that "§ 1983 is not an adequate alternative remedy for state-constitutional claims that rely on a theory of respondeat superior." *Alwan v. City of New York*, 311 F. Supp. 3d 570, 587 (E.D.N.Y. 2018) (collecting cases). Accordingly, to the extent that any of Plaintiff's claims are brought under a theory of respondeat superior, they may not be dismissed as duplicative of the § 1983 claims. *See Herrera v. Shea*, No. 20-CV-3665, 2020 WL 7711856, at *10 (E.D.N.Y. Dec. 29, 2020) (explaining that "[w]hereas a Section 1983 claim under *Monell* may not be premised on a theory of respondeat superior, . . . a similar claim under Article I, § 12 of the New York State Constitution may be"); *see also Hawthorne by Hawthorne v. County of Putnam*, 492 F. Supp. 3d 281, 305 (S.D.N.Y. 2020) (finding § 1983 did not provide adequate alternative to state law claims premised on respondeat superior theory); *Sullivan v. City of New York*, No. 17-CV-3779, 2018 WL 3368706, at *21 (S.D.N.Y. July 10, 2018) (same). Therefore, to the extent that any of Plaintiff's state law claims are being pursued against the County on a theory of respondeat superior, the existence of the Section 1983 cause of action does not preclude their being pursued.

Nevertheless, the Court agrees with Defendants that the deficiencies with Plaintiff's false arrest, malicious prosecution, and malicious abuse of process claims—each of which relies on New York State law for the substance of the claims—likewise entitle the Defendants (including the County) to summary judgment on those claims. The same is true of the state free speech clause and state equal protection law claims, as each is analyzed under a substantively identical standard to the corresponding federal claim, and no Party has argued otherwise. *See*

*Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 945 F.3d 83, 110 (2d Cir. 2019) ("The equal protection guarantees under the New York Constitution are coextensive with those under the U.S. Constitution. Consequently, the [same] analysis . . . applies to [Plaintiff's] equal protection claims under the New York Constitution." (citing *People v. Kern*, 554 N.E.2d 1235 (N.Y. 1990)); *Eric Adams 2025 v. New York City Campaign Fin. Bd.*, 790 F. Supp. 3d 170, 195 n.24 (E.D.N.Y. 2025) ("[F]ree speech claims under Article 1, Section 8 of the New York State Constitution are subject to the same analysis as free speech claims under the First Amendment." (quotation marks omitted)). This appears to leave intact Plaintiff's first cause of action for excessive force and unreasonable seizure, to the extent she relies on state law for this claim, her sixth cause of action (asserting municipal liability for the actions alleged in her complaint) insofar as it is based on a theory of respondeat superior for the other remaining claims, and her seventh cause of action for assault and battery.

## III. Conclusion

For the reasons set forth above, the Motion for Summary Judgment is granted in part and denied in part. Specifically, the Motion is granted except insofar as it requested that the Court grant summary judgment as to any state law claims against the County corresponding to the remaining live claims brought under federal law on a theory of respondeat superior, *i.e.*, Plaintiff's first cause of action for excessive force and unreasonable seizure, and her seventh claim for assault and battery. The Clerk of Court is respectfully directed to terminate the pending Motion at Dkt. No. 94.

This Opinion and Order is to be filed under seal, made visible only to the Court, the Parties, and the Parties' attorneys, as it quotes extensively from materials filed under seal. The

Case 7:22-cv-06443-KMK-VR Document 111 Filed 11/02/26 Page 70 of 70

Parties are directed to provide proposed redactions by no later than 30 days from the date of this Opinion.

SO ORDERED.

Dated: September 29, 2026
White Plains, New York



KENNETH M. KARAS
United States District Judge